PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AW,[1] by his parents, Debra D.
Wilson and Christopher D. Wilson,
    *Plaintiff-Appellant,*

  v.

FAIRFAX COUNTY SCHOOL BOARD,
    *Defendant-Appellee.*

No. 03-1181

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-02-1215-A)

Argued: January 22, 2004

Decided: June 24, 2004

Before MOTZ, KING, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in
which Judge Motz and Judge King joined.

---

## COUNSEL

**ARGUED:** Hunter Craycroft Harrison, Jr., McLean, Virginia, for
Appellant. John Francis Cafferky, BLANKINGSHIP & KEITH, Fair-

---

[1]The court has revised the caption of this appeal in order to protect the
identity of the minor student on whose behalf the underlying action was
filed.

fax, Virginia, for Appellee. **ON BRIEF:** Jennifer L. Redmond, BLANKINGSHIP & KEITH, Fairfax, Virginia; Thomas J. Cawley, HUNTON & WILLIAMS, McLean, Virginia, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

AW, a disabled student in Fairfax County, Virginia, appeals the district court's judgment in favor of the Fairfax County School Board ("FCSB") in his suit under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487 (West 2000 & Supp. 2003) ("the IDEA"). In his complaint, AW asserted that the FCSB improperly refused to allow him to enroll at his preferred junior high school after a pattern of misbehavior in the preceding school year resulted in his mid-year transfer to an elementary school that sent its students on to a different junior high school. Specifically, AW alleged that the FCSB's transfer decision violated the procedural and substantive protections afforded him under the IDEA, including its "stay-put" provision requiring that the student's "educational placement" not change while disciplinary proceedings are pending. Because we conclude that the term "educational placement" as used in the stay-put provision refers to the overall educational environment rather than the precise location in which the disabled student is educated, we affirm.

I.

In March 2002, AW was a sixth-grade student assigned to the "gifted and talented" program (the "GT program") at his elementary school. During the prior school year, a committee at AW's school concluded that AW was eligible to receive special education assistance under the IDEA as a student with an emotional disability. That determination resulted in the formulation of an Individualized Educational Program ("IEP") for AW that devoted one hour of each school week to specialized education intended to alleviate AW's "difficulty maintaining focus and completing academic tasks as required" and avoidance of "many tasks, especially when they involve writing." J.A. 135. AW successfully completed the remainder of his fifth-grade

year, and his IEP was revised the following year in accordance with IDEA procedure.

As a sixth-grader, AW began exhibiting behavior problems he had not displayed during the first year of his IDEA program. These disciplinary issues culminated in a March 2002 incident in which AW persuaded another student to place a threatening note in the computer file of a student that AW disliked.[2] In the ensuing inquiry, AW admitted that his intent was to scare the targeted student away from school. Based on his admission and past behavioral problems, school administrators suspended AW from school for two school weeks and initiated proceedings to expel AW.

As required by the IDEA, school officials convened a Manifestation Determination Review ("MDR") committee in order to determine the extent to which AW could be disciplined. Under the IDEA, a disabled student may not be disciplined by his school unless an MDR committee concludes that the student's IEP was appropriate relative to his qualifying disability and that the student's disability did not inhibit his capacity either to appreciate that his behavior was inappropriate or to conform his behavior to expectations. *See* 20 U.S.C. § 1415(k)(4) (2000). On the ninth day of AW's suspension, the MDR committee concluded that AW's IEP appropriately compensated for his emotional disability and that AW's disability did not prevent him from either understanding that his actions violated school rules or behaving appropriately. This finding opened the door for the FCSB to discipline AW as it would any other student. *See* 20 U.S.C. § 1415(k)(5) (2000). The following day, however, a FCSB administrator rejected the expulsion recommendation from the administrators of AW's school and directed instead that AW be transferred to the GT program at another FCSB elementary school for the remainder of the school year. It is undisputed that AW would continue to receive the one hour per week of special education at this new location.

Despite the transfer determination, AW returned to his original school at the conclusion of his suspension to complete the final week of school before spring break. During this week, AW continued to

---

[2]That message, which appeared anonymously in the targeted student's account, read "DEATH AWAITS YOU."

receive GT program course work but was separated from his class and assigned instead to an empty classroom. As the week drew to a close, AW's parents invoked their right under the due process procedures of the IDEA to a review of the MDR determination. The appointed due process review officer ("DPR Officer") issued a pre-hearing decision staying the FCSB administrator's transfer decision, and AW returned to his original school following spring break.

At the April 17, 2002 hearing regarding the MDR committee's findings, AW's psychologist testified that AW had Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiance Disorder ("ODD"). AW's psychologist opined that AW's IEP failed to adequately compensate for ODD and that AW's combination of conditions figured prominently in the behavior for which he was disciplined. Nevertheless, the DPR Officer concluded that the MDR committee's conclusion was sound and that the FCSB could transfer AW to a nearby school with a comparable GT program, based in part on his conclusion that the evidence did not support the findings of AW's psychologist. The DPR Officer's order released the FCSB to transfer AW to another elementary school located approximately five miles away from AW's original school, and AW completed his sixth-grade year at that school.

Following their unsuccessful attempts to enroll AW at the junior high he would likely have attended but for his transfer, AW's parents filed the complaint in this case on AW's behalf on August 16, 2002. The complaint alleged that the FCSB violated the IDEA's "stay-put" provision by transferring AW despite the ongoing challenge to the MDR committee's determination under the IDEA's review procedures, and that the MDR committee erred in concluding that AW could be disciplined as any other student. The district court granted judgment in favor of the FCSB, and AW timely appealed.

## II.

This Court reviews the district court's interpretation of the IDEA *de novo*. *Wagner v. Bd. of Educ.*, 335 F.3d 297, 301 (4th Cir. 2003). When a district court reviews a state administrative decision under the IDEA, that court must make an "independent decision based on a preponderance of the evidence." *Doyle v. Arlington County Sch. Bd.*, 953

F.2d 100, 103 (4th Cir. 1991). In doing so, however, the court must accord the administrative findings "due weight," as "the primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the IDEA to state and local educational agencies in cooperation with the parents or guardian of the child." *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir. 1998) (internal quotation marks and alterations omitted).

The IDEA confers upon disabled students substantive and procedural rights that ensure the child's right to "public education in participating States." *Honig v. Doe*, 484 U.S. 305, 310 (1988). Substantively, the IDEA requires participating states to provide all disabled children with a free appropriate public education ("FAPE") as a condition to the receipt of federal funds. *See* 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1) (2000).[3] As an adjunct to this requirement, school officials must create an IEP for each qualifying child to ensure that the school district is properly discharging this obligation with respect to each disabled student. *See* 20 U.S.C. § 1414(d)(1)(2000). Procedurally, the IDEA "guarantee[s] parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311-12. This includes the "opportunity to present complaints with respect to any matter relating to the identification, evaluation, or *educational placement* of the child." 20 U.S.C. § 1415(b)(6)(2000)(emphasis added).[4]

AW presents two issues in this appeal. First, AW asserts that his mid-year transfer by the FCSB violates the "stay-put" provision of the IDEA, 20 U.S.C. § 1415(j)(2000), as the due process review guaranteed to AW's parents under the IDEA was still proceeding. Second, AW challenges the substantive determination by the MDR committee that allowed the FCSB to discipline AW in the same manner as any non-disabled student. We consider each issue in turn.

---

[3]A FAPE constitutes an education that is specifically designed "to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child to benefit from the instruction." *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002).

[4]*See also Honig*, 484 U.S. at 312 (discussing prior version of section).

III.

The first issue raised by AW in this appeal is whether the FCSB's decision to transfer him mid-year to the GT program at another school violated the "stay-put" provision of the IDEA. This provision mandates that "during the pendency of any proceedings conducted pursuant to this section, . . . the child *shall remain in the then-current educational placement of such child*," absent the consent of school officials and the parents. *Id.* (emphasis added). AW argues that the term "educational placement" encompasses not simply the particular school to which the student is assigned, but the very classroom in which he or she receives his or her instruction. According to AW, the "stay-put" provision thus requires the FCSB to keep him not only in the GT program, but to keep him in the specific GT program classroom to which he was originally assigned. In response, the FCSB argues that "educational placement" cannot have so specific a definition. The FCSB maintains that the "stay-put" provision protects against a change in overall educational environment, rather than physical location. We must therefore determine what Congress meant by the term "educational placement" and whether the FCSB's transfer of AW constituted a change in his then-current educational placement.

A.

In interpreting a statute, we start with the text of the provision at issue, which here states that school officials may not change a student's "then-current educational placement" while disciplinary proceedings are pending. 20 U.S.C. § 1415(j). By mandating that the student's "educational placement" remain undisturbed for the duration of any proceedings related to the disciplinary decision, the "stay-put" provision circumscribes school officials' ability to unilaterally discipline students covered by the IDEA. *See Erickson v. Albuquerque Public Schs.*, 199 F.3d 1116, 1121 (10th Cir. 1999); *Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S.*, 96 F.3d 78, 83 (3d Cir. 1996). However, "[n]either the statute nor the legislative history provides guidance for a reviewing court on how to identify 'the then current educational placement.'" *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1133 n.22 (9th Cir. 2003) (internal quotation marks omitted) (quoting *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 865 n.13 (3d Cir. 1996)). Indeed, the IDEA does not define

the term "educational placement." *Erickson*, 199 F.3d at 1121. While undefined terms in a statute must be given their ordinary meaning, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995), and the terms "educational" and "placement" do have such definitions, it is clear that Congress intended these words to be construed together as a term of art. Hence, a recitation of the ordinary meaning of these independent terms is of little utility. *Cf. In re S. Star Foods, Inc.*, 201 B.R. 291, 293 (Bankr. E.D. Okla. 1996) (noting that an undefined term of art that may be read narrowly or broadly is ambiguous).

Judicial construction of the term "educational placement" has generally failed to provide significant clarification. Rather, courts have alternatively defined the term narrowly or broadly depending on the circumstances. Thus, for example, educational placement has been found to refer to anything from "the physical school attended by a child [to] the abstract goals of a child's IEP" in varying contexts. *Bd. of Educ. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548-549 (7th Cir. 1996) (collecting cases).[5] We do not find such an elastic approach to provide guidance here.[6]

---

[5]At least one court has attempted to synthesize these definitions by stating that

> [a] transfer to a different school building for . . . reasons unrelated to the disabled child has generally not been deemed a change in placement, whereas an expulsion from school or some other change in location made on account of the disabled child or his behavior has usually been deemed a change in educational placement that violates the stay-put provision if made unilaterally.

*Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 834 (8th Cir. 2002). However, courts like *Hale* have reached such conclusions in the context of expulsions and similar changes in location that result in the denial of educational services altogether.

[6]On occasion, of course, the Supreme Court has concluded that it is appropriate to allow the definition of a statutory term to be defined by the factual context in which it is to be applied. In *Commissioner v. Groetzinger*, the Court declined to adopt a universal definition of "trade or business" under the Internal Revenue Code due to "the Code's wide utilization in various contexts of the term 'trade or business,' in the absence of an all-purpose definition" and the concern that "an attempt

The Supreme Court, however, has indirectly provided insight into the definition of "educational placement" through its discussions of the proper application of the "stay-put" provision. In discussing precursors to the current "stay-put" provision, the Court has twice indicated that its purpose was to "prevent school officials from *removing a child from the regular public school classroom* over the parents' objection pending completion of the review proceedings." *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 373 (1985); *see also Honig*, 484 U.S. at 323 (noting the "stay-put" provision was intended "to strip schools of the *unilateral* authority they had traditionally employed to *exclude* disabled students, particularly emotionally disturbed students, from school" (second emphasis added)).

The Court has also indicated that the IDEA was not intended to "leave educators hamstrung." *Id.* at 325. To that end, the Court has held that the "stay-put" provision is not so limiting as to prevent school officials from resorting to temporary changes short of exclusion, including "the use of study carrels, timeouts, detention, or the restriction of privileges." *Id.* According to the Court, such options constitute only minor departures from prior assignments and "do[ ] not carry the potential for total exclusion that Congress found so objectionable." *Id.* at 325-26 & n.8. Thus, any definition of "educational placement" must reflect the fact that the "stay-put" provision is not implicated by temporary changes that track previous assignments as closely as possible and do not affect a student's FAPE.[7] *See United*

_____

judicially to formulate and impose a test for all situations would be counterproductive, unhelpful, and even somewhat precarious for the overall integrity of the Code." 480 U.S. 23, 36 (1987). Nevertheless, we are not persuaded that multiple definitions of the same term are necessary in this context, and the parties have failed to indicate a basis from which to conclude that Congress intended a definition of "educational placement" that is predicated on the factual context in which its application arises. Although the terms underlying the IDEA's statutory scheme "tend[ ] toward the cryptic rather than the comprehensive, . . . that is scarcely a reason for abandoning the quest for legislative intent." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188 (1982).

[7]Other provisions in the IDEA beyond the "stay-put" provision reflect *Honig*'s influence. In particular, § 1415(k)(1) notes that a school offi-

*States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) (noting that it may be presumed that Congress "acts with knowledge of existing law, and that absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction" (internal quotation marks omitted)).

The foregoing "stay-put" jurisprudence indicates that the provision is certainly violated by a change in location that leads to an outright denial of educational services. However, the Supreme Court has clarified that temporary changes in location do not violate the "stay-put" provision provided they do not result in a diminution of the educational services to which the student is entitled. Since the circumstances of AW's transfer do not fall into either category, resolution of this appeal requires a clearer definition of the term "educational placement."

## B.

Because the IDEA does not define "educational placement" and, as a term of art, the term lacks an ordinary meaning, we must examine

cial's decision to temporarily assign a student to an "interim alternative educational setting [or] another setting," or to suspend the student, constitutes an explicitly authorized "change in the placement of a child with a disability." 20 U.S.C. § 1415(k)(1)(A)(i) (2000). This provision tracks the holding in *Honig*: that school officials may resort to temporary suspensions or lesser disciplinary measures without effecting a change in the student's "educational placement." 484 U.S. at 325. Although the IDEA does not define "placement" or "setting" either, it uses these terms in the context of a disciplinary provision which places them in contradistinction to a student's educational environment prior to being disciplined. *See* § 1415(k)(1)(A)(i). The least dramatic departure from the student's environment authorized by the IDEA is an assignment to an "interim alternative educational setting," which the IDEA describes as a setting that allows the student to continue his educational program without interruption. *See* §§ 1415(k)(1)(A)(i), (3)(B)(i). At the other end of the spectrum is suspension, an option which permits the school to deny the student access to both his or her regular educational program and the school itself. Thus, a change in "placement" occurs when a school places the student in a setting that is distinguishable from the educational environment to which the student was previously assigned.

the IDEA to distill a definition that "can most fairly be said to be in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *Comm'r v. Engle*, 464 U.S. 206, 217 (1984) (internal quotation marks omitted). Toward that end, we note that the IDEA rests on two primary premises: that all disabled students receive a FAPE and that each disabled student receive instruction in the "least restrictive environment" ("LRE") possible. *See, e.g.*, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 180-82 (1982) (discussing precursor to the IDEA); *Bd. of Educ. v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999) (discussing 34 C.F.R. § 300.550 (2003)).

As noted above, the FAPE requirement addresses the substantive content of the educational services the disabled student is entitled to receive under the IDEA. The LRE requirement reflects the IDEA's preference that "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled." *See* 20 U.S.C. § 1412(a)(5) (2000); 34 C.F.R. § 300.550(b)(1). However, this preference for "mainstreaming" disabled students is not absolute; § 1412(a)(5) permits the delivery of educational services to disabled students in less integrated settings as necessitated by the student's disability. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 330 (4th Cir. 2004).

Although the foregoing indicates that the definition of "educational placement" should reflect the "mainstreaming" ideal of the LRE requirement, it does not appear that the term also includes the precise physical location where a disabled student is educated. The LRE requirement directs that the disabled student be assigned to a setting that resembles as closely as possible the setting to which he would be assigned if not disabled. *See Rowley*, 458 U.S. at 202-03 & n.24. The IDEA's concern with location thus focuses on the degree to which any particular assignment segregates a disabled student from non-disabled students, rather than on the precise location of the assignment itself. Given the IDEA's concern with "mainstreaming" and appropriate educational content, we find little support in the IDEA's underlying principles for AW's assertion that "educational placement" should be construed to secure his right to attend school in a particular classroom at a particular location.

## C.

The IDEA's emphasis on educational content and instructional environment are reflected in the regulations promulgated by the Department of Education. Indeed, in a recent case, the parents of a disabled student challenged the school district's decision to transfer their disabled child to another school as violative of the IDEA's "stay-put" provision by citing 34 C.F.R. § 300.552 (2003), which provides criteria for determining a disabled student's "'educational placement.'" *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373 at 379-80 (5th Cir. 2003). Noting the directive in § 300.552 that the "placement" assignment be "as close as possible to the child's home" and that the child be "educated in the school that he or she would attend if nondisabled," the parents argued that "educational placement" extends to the particular building to which their child was assigned. 343 F.3d at 379-80.

As noted by the *White* court, however, another provision in the regulations undercuts this interpretation and suggests that the regulations continue the IDEA's concern with the extent to which any particular assignment reflected the "mainstreaming" ideal, rather than the precise location of that assignment. Section 300.551 describes different "placement" options that school boards must make available to disabled students, including "regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.551 (2003). Noting that these options were differentiated from each other by the extent to which they departed from a "mainstream" assignment, the court concluded that the term "placement" as used in the regulations refers only to the setting in which the student is educated, rather than the precise location. *See* 343 F.3d at 380. To the extent § 300.552(b) states that school officials shall ensure that the placement "is as close as possible to the child's home," this language does not mandate that the student be assigned to the closest school, but simply to one that is as "close as possible."[8]

---

[8]At argument, counsel for AW argued that the school officials and hearing officer in question lacked the authority to transfer AW during the school year, apparently relying on 8 Va. Admin. Code § 20-80-68(C) (2001). While we are aware of cases holding that "state standards that

Consideration of the structure and the goals of the IDEA as a whole, in addition to its implementing regulations, reinforces our conclusion that the touchstone of the term "educational placement" is not the location to which the student is assigned but rather the environment in which educational services are provided. To the extent that a new setting replicates the educational program contemplated by the student's original assignment and is consistent with the principles of "mainstreaming" and affording access to a FAPE, the goal of protecting the student's "educational placement" served by the "stay-put" provision appears to be met. Likewise, where a change in location results in a dilution of the quality of a student's education or a departure from the student's LRE-compliant setting, a change in "educational placement" occurs.[9]

D.

In light of our conclusion that "educational placement" fixes the overall instructional setting in which the student receives his education, rather than the precise location of that setting, we conclude that AW's transfer between such materially identical settings does not implicate the "stay-put" provision of § 1415(j). *See White*, 343 F.3d at 380. The parties do not dispute that the GT program at the nearby elementary school to which the FCSB transferred AW was materially identical in its educational offerings and that AW would be placed in an identical setting (a regular GT program classroom). Moreover, there is nothing in the record to suggest that the new location selected

---

impose a greater duty to educate disabled children," if consistent with federal standards, "are enforceable in federal court under the IDEA," *Erickson*, 199 F.3d at 1122 (internal quotations omitted), § 20-80-68(C) addresses "[l]ong-term removals" and, as noted above, the transfer did not constitute a removal from AW's setting.

[9]We recognize the possibility that a transfer to a different school might entail a commute so long or arduous as to negatively impact the student's ability to excel in the otherwise identical setting. However, we are not confronted by this issue in this appeal. The materials provided by the parties indicate that the schools at issue are separated by less than five miles; the school to which AW was transferred is less than two miles farther away from his home.

for AW by the FCSB would work such a change in the student's routine that the new location cannot fairly be described as an identical setting.[10]

We note further that our interpretation of "educational placement" would not change the result of the cases on which AW relies. The numerous cases cited by AW reached their conclusions in the context of a clear change in setting under the definition described above, such as an indefinite expulsion. *See, e.g.*, *Honig*, 484 U.S. at 312 (two emotionally disturbed students expelled indefinitely); *Sch. Bd. of Prince William County v. Malone*, 762 F.2d 1210, 1212 (4th Cir.

---

[10]In his brief, AW notes that his February 2002 IEP, implemented just days before the incident for which he was suspended, states that AW "will be attending the GT center at Kilmer [Middle School]," the school to which he would likely have continued, "in 7th grade." J.A. 158. We are not persuaded that AW's characterization of this statement as controlling of his future placement is correct, however. As a threshold matter, the IDEA only requires that an IEP specify the location where the student's *special education* and related services are to be received, not where the student pursues his general educational program. *See* § 1414(d)(1)(A)(vi). Given that there are separate statutory and regulatory provisions regarding "placement," including provisions suggesting that the IEP and placement issues are separate and successive considerations, *see, e.g.*, 34 C.F.R. § 300.300(a)(3)(ii) (stating that placement decisions should be made based on the child's "unique needs"); 34 C.F.R. pt. 300, app. A (noting that "[t]he appropriate placement for a particular child . . . cannot be determined until after decisions have been made about the child's needs and the services that the public agency will provide"), we find it incongruous to conclude that any statement in a current IEP regarding future placement should be controlling. Second, AW's February 2002 IEP was superseded in April when AW's IEP team reconvened in the wake of AW's suspension as required by § 1415(k) and instituted a revised IEP that omitted any reference to future placement. Although AW's parents indicated their dissatisfaction with AW's April IEP by declining to sign it, the right conferred by the IDEA on parents to participate in the formulation of their child's IEP does not constitute a veto power over the IEP team's decisions. *See White*, 343 F.3d at 380 (collecting cases). Third, our review of the materials in the joint appendix reveals no other basis to conclude the FCSB could not unilaterally elect to deny AW enrollment at the junior high of his choice had the March 2002 incident not occurred.

1985) (expulsion for remainder of school year); *Kaelin v. Grubbs*, 682 F.2d 595, 598 (6th Cir. 1982) (expulsion for remainder of school year); *S-1 v. Turlington*, 635 F.2d 342, 348 (5th Cir. 1981) ("[E]xpulsion is still a proper disciplinary tool under the (Education for all Handicapped Children Act) . . . when proper procedures are utilized and under proper circumstances."), *abrogated on other grounds by Honig*, 484 U.S. at 317; *cf. Hale*, 280 F.3d at 832 (transfer from home schooling to a school). Under our interpretation of "educational placement," such actions would still violate the "stay-put" provision as they constitute clear and permanent changes in setting. Because the FCSB's decision to change the location of AW's assignment did not result in a change in educational setting, we find the transfer decision did not violate the "stay-put" provision.[11]

## IV.

AW's substantive challenge to the FCSB's transfer decision addresses the adequacy of the MDR committee's determination that his disability did not factor into the conduct for which he was suspended. As noted above, the IDEA requires that before any school can discipline a student, the school must determine whether the student's misconduct is related to the student's disability. If it is, the school officials are confined to the limited disciplinary measures

---

[11]Finally, even if the "stay-put" provision were violated here, the circumstances of this case appear to foreclose the possibility of relief. At the time of the transfer in April 2002, AW was just months away from graduating from sixth grade and moving on to the seventh grade at another school. While the "stay-put" provision does remain in effect until the conclusion of both administrative and judicial review, including this appeal and any subsequent review by the Supreme Court, *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 6 (1st Cir. 1999), it would be unworkable at this juncture to return AW to his "then-current educational placement" as defined in his brief. AW does not seek to use the "stay-put" provision, as he interprets it, to return to his educational placement as it existed prior to his transfer: his sixth-grade classroom at his original school. Rather he seeks to return to the junior high school track that would have flowed from the earlier assignment. However, AW would have been subject to the transfer at the conclusion of the review process, making the junior high school track applicable to the school to which he was ultimately transferred the appropriate one.

described in § 1415(k)(1)(A)(i). However, if the MDR committee concludes that the child's disability did not factor into the student's conduct, then the school may discipline that student as it would any other. *See* § 1415(k)(5).

The issues the MDR committee must consider are clearly defined by the IDEA. The MDR committee must gather "all relevant information," including any "evaluation or diagnostic results," any "observations of the child," and "the child's IEP and placement." *See* § 1415(k)(4)(C)(i). The MDR committee must then decide whether: (1) "the child's IEP and placement were appropriate and the special education services . . . were provided consistent with the child's IEP and placement"; (2) the child's disability impaired his ability to understand "the impact and consequences of the behavior subject to disciplinary action"; and (3) the child's disability impaired his ability "to control the behavior subject to disciplinary action." § 1415(k)(4)(C)(ii).

The parties disagree as to the nature of AW's disability. Although it is undisputed that AW suffers from ADHD and ODD, the hearing officer and district court concluded that these disorders did not figure in the "emotional disability," J.A. 72, that rendered AW eligible for special education under the IDEA. The hearing officer and district court concluded instead that these conditions constituted "social maladjustment," *id.*, which was not a basis for coverage under the IDEA, and therefore the MDR committee need not have inquired whether these conditions impacted the adequacy of AW's IEP or his conduct.

Based on our review of the record, we conclude the MDR committee's conclusion was sound, although for slightly different reasons than relied on by the district court. AW's IDEA eligibility form is only marginally instructive, as it states that AW is eligible based on his "difficulties maintaining focus and completing academic tasks as required" and avoiding "many tasks, especially when they involve writing." J.A. 135. Additionally, the form notes that "Social Maladjustment has been ruled out as the PRIMARY cause of identified characteristics," *id.*, but does not exclude the possibility that it plays a secondary role in his qualifying disability.

A psychological and educational evaluation conducted in December 2000, however, indicates that while ADHD was a central feature

of the emotional disability that qualified AW for special education services under the IDEA, ODD was not. In that evaluation, a psychologist at AW's elementary school concluded that AW's primary difficulty was his inability to concentrate and hyperactivity, two undisputed symptoms of ADHD. Although the evaluation also noted AW's tendency towards "frequent confrontations with authority figures," and that "*[t]his behavioral pattern may also lead to difficulties relating to peers at times*," *id.* at 171 (emphasis added), the evaluation nevertheless makes clear that AW's primary difficulty was behavior associated with ADHD that hampered his ability to thrive educationally. The psychologist concluded that "structure, consistency, predictability, and immediate feedback are critical in the development of any plan to address difficulties related to attention, impulsivity and concentration," and recommended that due to AW's hyperactivity, "*teachers [should] consider a variety of modifications in his school program*," which would apparently include the very special education services subsequently implemented through AW's IEP. *Id.* at 173 (emphasis added). By contrast, with respect to AW's "interpersonal and emotional difficulties," the evaluation concluded that outside counseling should be encouraged. *Id.* This evaluation strongly suggests that ADHD figured prominently in AW's qualifying disability, but ODD did not.

We therefore find no error in the MDR committee's conclusion that AW's IEP and placement in a general curriculum GT program was appropriate, and that his ADHD did not figure into the behavior for which he was to be disciplined. With respect to the adequacy of AW's IEP, we note that the IEPs of February 2001 and February 2002 focused on the complications occasioned in AW's schoolwork by his ADHD and identified his "social/emotional" difficulties as a matter for out-of-school counseling with a private counselor. This approach conforms to the recommendations made by the school psychologist in his evaluation of AW just prior to AW's IDEA eligibility determination. Moreover, nothing in the IEPs or the school psychologist's evaluation suggests that AW's interpersonal difficulties were so substantial that they could not be managed by outside counseling or that they would be exacerbated by being placed in the general GT curriculum with other students.

We likewise find no basis in the administrative record to conclude that ADHD figured into the conduct for which AW was disciplined.

It is undisputed that AW is an intelligent student, and that AW was not only aware of the consequences of sending the threatening message to the targeted student, but anticipated them by enlisting another student to actually place the note. To the extent that students with ADHD may be described as impulsive, the circumstances of the conduct for which AW was disciplined indicated forethought and investigation, as he had to figure out a way to gain access to his target's personal folder. Given these circumstances, we find no error in the MDR committee's conclusion that AW's IEP and placement were appropriate to his ADHD, and that his ADHD did not figure into the conduct for which he was disciplined by the FCSB.

V.

Because we find that the specific location where the student is being educated is not controlling in a determination of educational placement in this context, and that the MDR committee's evaluation was appropriate given the nature of AW's disability, we find no error in the reasoning of the DPR Officer or the district court. Accordingly, the district court's order is

*AFFIRMED.*