**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1167**

COUNTY SCHOOL BOARD OF YORK COUNTY, VIRGINIA,

Plaintiff - Appellant,

versus

A. L., and his parents and next friends; A.
L.; S. L.,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Newport News. Henry Coke Morgan, Jr.,
Senior District Judge. (CA-03-174)

Argued: May 23, 2006                Decided: August 16, 2006

Before WIDENER, WILLIAMS, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Kathleen Shepherd Mehfoud, REED SMITH, L.L.P., Richmond, Virginia,
for Appellant. Shannon Marie Manning, VIRGINIA OFFICE FOR
PROTECTION & ADVOCACY, Virginia Beach, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

The County School Board of York County, Virginia (the "Board"), appeals the January 18, 2005 judgment issued in the Eastern District of Virginia in favor of A.L., a disabled student who suffers from Down Syndrome.[1] In 2003, after A.L. and his parents were unable to agree to an individualized education program (an "IEP") proposed by the Board, the Board sought an impartial due process hearing to authorize implementation of its proposal. Following the due process hearing, the hearing officer concluded, by decision of August 25, 2003 (the "Administrative Decision"), that the Board's proposal (the "Proposed IEP") was legally insufficient under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the "IDEA"). Thus, the Board was ordered to develop an appropriate IEP for A.L. in accordance with the IDEA.

In December 2003, the Board filed its complaint in the district court, seeking review of the Administrative Decision. Thereafter, by Opinion and Order of January 18, 2005, County Sch. Bd. of York County, Va. v. A.L., No. CA-03-174 (E.D. Va. filed Jan. 18, 2005) (the "Court Decision"), the court affirmed the three rulings of the Administrative Decision challenged by the Board in

---

[1]Down Syndrome (also known as Down's Syndrome) is a "congenital disorder caused by the presence of an extra 21st chromosome and marked by moderate to severe mental retardation, short stature, and a flattened facial profile." Webster's II New College Dictionary 342 (1995).

2

this appeal: (1) that the Board committed procedural violations regarding the Proposed IEP (the "Procedural Ruling"); (2) that the sign language communication assistance contemplated by the Proposed IEP failed to comply with Virginia's regulations (the "Sign Language Ruling"); and (3) that A.L. is entitled to an IEP providing him with direct occupational therapy services (the "OT Ruling"). Additionally, at oral argument the Board asserted, for the first time, that the Court Decision should be vacated on mootness grounds. As explained below, we reject the Board's contentions and affirm the district court's order that an IEP be developed "which provides A.L. a [free appropriate public education] under the IDEA." Court Decision at 12.[2]

I.

A.

A.L. is a 20-year-old student at Grafton High School in York County, Virginia. As a result of Down Syndrome, A.L. has difficulty speaking, and he must use sign language to clarify his communications with others. Because of his disability, A.L. is eligible for special education and related services by the Board. His access to such education and services is governed by the IDEA, which mandates that school districts provide IEPs for disabled

---

[2]The Court Decision is found in its entirety at pages 1186 through 1197 of the Joint Appendix.

3

students.  See 20 U.S.C. § 1414(d).  Under the IDEA, an IEP is a written statement setting forth a school district's plan for educating and accommodating a child with a disability, prepared by an "IEP team" consisting of a representative of the school district, the disabled student's teachers, the student's parents, and the student.  See §§ 1414(d)(1)(A)-(B); MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 527 (4th Cir. 2002).  An IEP must contain statements concerning the disabled student's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress.  See § 1414(d)(1)(A).

The Board first developed and implemented an IEP for A.L. in June 2001.  A.L.'s IEP was thereafter revised by certain addenda, the most recent in August 2002.  Although the IEP team members met several times during the 2002-2003 school year to develop a new IEP for A.L., they were unable to reach any consensus.  During that time, A.L.'s parents expressed their desire for him to participate in the Virginia Alternate Assessment Program (the "VAAP"), a test employed to assess the performance of students, such as A.L., who have traditionally been exempt from educational assessment programs.  A chief source of disagreement among the IEP team members concerned whether A.L. should receive sign language services consistent with Virginia's Regulations Governing Special Education Programs.  The IEP team members also disagreed on whether

4

A.L. was required to continue receiving direct OT services. Although the Proposed IEP resulted from these meetings and various discussions among the IEP team, it was not agreed to by A.L.'s parents because it failed to provide A.L. with direct OT services and a sign language interpreter (an "SLI") meeting the qualifications for an SLI, as established by the pertinent Virginia regulations.

B.

In May 2003, the Board requested a due process hearing, pursuant to 20 U.S.C § 1415(f)(1)(A), seeking authorization to implement the Proposed IEP. As a result of this request, a hearing officer was appointed by the Virginia Department of Education's Division of Special Education, and the due process hearing was conducted over a period of five days in July and August 2003 (the "Hearing"). The Hearing revealed, inter alia, that A.L. had been excluded from participation in the VAAP. A.L.'s parents had earlier agreed with the Board that A.L. should participate in the VAAP, and that agreement had been spelled out in an earlier draft of the Proposed IEP. See Administrative Decision at 44;[3] see also J.A. 44-46. The parents first learned at the Hearing, however, that the Board had removed the VAAP provision from the Proposed IEP

---

[3]The Administrative Decision is found in its entirety at pages 1049 through 1101 of the Joint Appendix.

because A.L. had been "promoted" to the twelfth grade, which, the Board asserted, rendered him (at the time of the Hearing) ineligible for the VAAP. Administrative Decision at 6. On August 25, 2003, by the Administrative Decision, the hearing officer concluded that the Proposed IEP was legally insufficient under the IDEA because it failed to provide A.L. with a "free appropriate public education" (a "FAPE"). The Administrative Decision also detailed the hearing officer's findings and conclusions in connection with its rulings, which are summarized, in pertinent part, below.

On the Procedural Ruling, the hearing officer concluded that the Board had contravened the IDEA's requirements in two ways: (1) it had revised the Proposed IEP to exclude A.L. from participation in the VAAP, without notifying A.L. and his parents of its decision; and (2) it had failed to inform A.L. and his parents that the revision to the Proposed IEP triggered their due process rights. See Administrative Decision at 45. The hearing officer observed that A.L.'s parents had requested (during the May 5, 2003 IEP team meeting) that he participate in the VAAP, but the Board later decided that he should not do so. Id. at 44-45. The officer also found that the Board's failure to permit A.L. to participate in the VAAP, as well as its failure to properly notify his parents thereof, had impaired A.L.'s ability to receive an IEP appropriately formulated for his individual needs and abilities.

6

Id. at 45. Moreover, the officer observed that A.L.'s promotion to the twelfth grade "appears to be one in name only as [A.L.] made minimal progress, at best, in core subjects and he will remain a 12th grader for 3 years." Id. The hearing officer then concluded that the Board's procedural violations rendered the Proposed IEP legally insufficient under the IDEA, and she ordered the Board to formulate a new IEP consistent with IDEA-mandated procedures. Id. at 51-53.

Next, with respect to the Sign Language Ruling, the Proposed IEP called for A.L. to receive "[c]ommunication [a]ssistance with expressive language/oral communication with peers and teachers," which assistance was to "include use of basic sign language as appropriate." See Administrative Decision at 46; see also J.A. 42. The Proposed IEP did not specify, however, who was to provide such communication assistance to A.L. J.A. 42. The hearing officer determined that the Proposed IEP was defective with respect to communication assistance services in two ways: (1) it was an inadequate accommodation of A.L.'s Down Syndrome disability, as well as of his Oral Motor Apraxia ("OMA"), a condition of the palate interfering with articulation;[4] and (2) it did not satisfy

---

[4]Beginning in 2001, A.L.'s parents contended that A.L. was entitled to be dually labeled with both Down Syndrome and OMA, but the Board determined that the OMA label was unnecessary. A.L.'s parents later consented to an addendum to the 2001 IEP, made in August 2002, providing full-time interpreter services to assist A.L. in his oral and/or sign language communications skills — an accommodation for his Down Syndrome, but not for his OMA. Although

7

Virginia's Regulations Governing Special Education Programs, because the Board proposed utilizing a "teacher assistant (basic sign language)" who did not satisfy the requirements of an SLI under the Virginia regulations. Id. at 46-48. Accordingly, the hearing officer mandated that the Board provide A.L. with a qualified SLI throughout the school year. Id. at 53.

Finally, with regard to the OT Ruling, A.L.'s parents and the Board disputed whether A.L required direct OT services in order to offset his deficiencies in the use of fine motor and visual skills. See Administrative Decision at 48. According to occupational therapist Julie Herndon, who had been providing A.L. with direct OT services since 2001, he did not require OT services at all, based on her 2001 assessment. Id. at 31. Thus, as a compromise, the Board incorporated consultative (rather than direct) OT services into the Proposed IEP, maintaining that such services sufficiently satisfied A.L.'s needs. Id. at 32.

In determining that the Board should continue to provide A.L. with direct OT services, however, the hearing officer rejected Herndon's evaluation and the Board's proposed solution, as well as the testimony of Dr. Lawrence Leichtman, A.L.'s treating physician and a specialist in mental retardation. Instead, the Board

---

the hearing officer acknowledged that she had not been appointed to review the Board's determinations regarding OMA, she nonetheless premised certain of her rulings on A.L.'s need for OMA accommodations.

credited a medical evaluation of A.L. submitted by his parents, which had been made in 2003, two years after the evaluation relied upon by the Board. See Administrative Decision at 49. The 2003 evaluation by occupational therapist Kristin Weisz indicated that A.L. was "slow," that he had difficulty with bilateral tasks and bilateral hand use, and that he required direct OT services. Id. at 32. Based on this more recent evaluation and Weisz's recommendation, the hearing officer ordered the Board to continue providing A.L. with direct OT services. Id. at 52.[5]

## C.

On December 30, 2003, the Board filed its complaint in the Eastern District of Virginia, pursuant to 20 U.S.C. § 1415(i)(2)(A), seeking to overturn the adverse rulings of the Administrative Decision. On January 18, 2005, after reviewing the record of the administrative proceedings and considering additional evidence submitted by the Board (as authorized under § 1415(i)(2)(A)), the court upheld the Procedural Ruling, the Sign Language Ruling, and the OT Ruling, concluding that the Board had

---

[5]The hearing officer further concluded that, because the IEP was inappropriate under the IDEA, it was also inappropriate under the Rehabilitation Act, 29 U.S.C. § 794, which mandates school districts to provide a FAPE to "handicapped persons" as adequate as that which is provided to "nonhandicapped persons." See 34 CFR § 104.33(b)(1). Under the federal regulations implementing the Rehabilitation Act, the development and implementation of an IEP "in accordance with the [IDEA] is one means of meeting [this] standard." Id. § 104.33(b)(2).

not carried its burden of establishing, by a preponderance of the evidence, that the hearing officer's determinations on these issues were erroneous. See Court Decision at 11-12.[6] The court thus ordered the Board to "develop an IEP which provides A.L. a FAPE under the IDEA." Id. at 12.[7] The Board has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

As a preliminary matter, the Board asserted at oral argument (for the first time), and thereafter by way of a supplemental brief, that a February 28, 2006 IEP addendum (the "2006 Addendum") served as a "replacement IEP which substantially alters A.L.'s placement and moots the issues in the case." See Appellant's Supp. Br. at 1. Specifically, the Board contends that the 2006 Addendum removed the goals and objectives of the Proposed IEP, with the

---

[6]The district court concluded that the hearing officer had erred in premising the Sign Language Ruling, in part, on the finding that A.L. required services for OMA. See Court Decision at 9. The court determined that any such error was harmless, however, because the hearing officer also correctly found that the IEP did not comply with Virginia's pertinent regulations. Id. at 10. We agree.

[7]With no evidence of bad faith or gross misjudgment on the part of the Board having been presented, however, the district court concluded that the Board had not discriminated against A.L. under the Rehabilitation Act. See Court Decision at 12. Nevertheless, the court ruled that the Proposed IEP was inadequate under the Rehabilitation Act, and it thus ordered the Board to develop an IEP that provides A.L. with a FAPE, in compliance with the Rehabilitation Act. Id.

10

exception of speech and language therapy, to address vocational training needs and measure the progress of vocational skills.  Id. at 7.  Accordingly, the Board has requested that we vacate the Court Decision and remand with instructions to dismiss its complaint.  A.L. correctly asserts, however, that the issues on appeal have not been rendered moot by the 2006 Addendum because it does not constitute, and the parties have not agreed to, "any IEP addressing or resolving the issues before this Court."  Appellee's Supp. Br. at 7.  Specifically, the 2006 Addendum does not allow A.L. to participate in VAAP, and it does not provide him with a qualified SLI in accordance with Virginia's regulations, or with direct OT services, all of which A.L. and his parents continue to seek.  As the parties have not agreed on the services A.L. is to be provided, the controversies with respect to the Administrative Decision are ongoing and viable, and the issues on appeal are not moot.  See City of Erie v. Pap's A.M., 529 U.S. 277, 277 (2000) (observing that case is moot when issues presented no longer constitute live controversy or when parties are without legal interest in outcome).  Thus, we reject the Board's mootness contention, and turn to the merits of the other issues it has raised on appeal.

11

III.

We review de novo a district court's interpretations of the IDEA. See AW v. Fairfax County Sch. Bd., 372 F.3d 674, 677 (4th Cir. 2004). When a district court reviews a hearing officer's administrative decision under the IDEA, it is obliged to make an "independent decision based on a preponderance of the evidence," according "due weight" to the officer's findings. Id. As we have explained, such a court should, "to the extent possible, defer to the considered rulings of the administrative officers, who also must give appropriate deference to the decisions of professional educators." MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 533 (4th Cir. 2002). Findings of fact made in such administrative proceedings are "considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." G v. Fort Bragg Dependent Schs., 343 F.3d 295, 302 (4th Cir. 2003) (internal quotation marks omitted). And, of course, a party challenging the conclusions of a hearing officer bears the burden of establishing that such rulings were erroneous. See Spielberg v. Henrico County Pub. Schs., 853 F.2d 256, 258 n.2 (4th Cir. 1988). When additional evidence has been received and considered by a district court, we review any findings of fact premised thereon for clear error. See G, 343 F.3d at 302 n.11.

12

Congress enacted the IDEA in 1990 to "ensure that all children with disabilities receive a [FAPE]," that includes "the special education and related services required to meet the unique needs" of disabled children.  See MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 526 (4th Cir. 2002).  Under the IDEA, a FAPE must provide a disabled child with meaningful access to the educational process, and it must be reasonably calculated to confer some educational benefit on the child.  See Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).  Such an educational benefit must be provided to the disabled child in the least restrictive environment available, with the child participating, to the extent possible, in the same activities as non-disabled children.  See 20 U.S.C. § 1412(a)(5)(A).  And while a school district "must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, . . . the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential."  Hartmann v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997) (internal quotation marks omitted).

The IDEA establishes a series of elaborate procedural safeguards, which are "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object

to these decisions." Gadsby v. Grasmick, 109 F.3d 940, 956 (4th Cir. 1997). Parents and school officials are each entitled to request and receive a due process hearing before a state administrative officer to determine the appropriateness of a proposed IEP. See 20 U.S.C. § 1415(b), (f). And, any party aggrieved by the findings or decision of the administrative officer at such a due process hearing may seek judicial review in either state or federal court. See id. § 1415(i)(A)(2).

In assessing whether an IEP satisfies the requirements of the IDEA, a court is obliged to employ the two-fold inquiry spelled out by the Supreme Court in Rowley. First, it must determine whether the school district has complied with the procedures set forth in the IDEA. See Rowley, 458 U.S. at 206. And second, the court must assess whether the IEP is reasonably calculated to allow the disabled child to receive educational benefits. Id. at 207; see also Spielberg, 853 F.2d at 258. With this framework in mind, we assess in turn the Board's contentions of error.

A.

With regard to the Procedural Ruling, the hearing officer found that the Board had committed two procedural violations: (1) failing to notify A.L.'s parents that it had revised the Proposed IEP to remove him from any participation in the VAAP; and (2)

14

failing to notify A.L.'s parents that this revision of the Proposed IEP triggered their due process rights. As we have heretofore recognized, "it is possible for a school district's failure to abide by the IDEA's procedural requirements to constitute an adequate basis for contending that the district has failed to provide a disabled child with a FAPE." MM, 303 F.3d at 533. Where a school district has failed to abide by the IDEA's procedural requirements, a reviewing court is "obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." Id.

Generally speaking, pursuant to 20 U.S.C. § 1415(d), a school district must give written prior notice of a proposed alteration of an IEP to a disabled child's parents, and it must also inform them of their due process rights. In this case, the Board maintains that its "technical violations" of this statutory mandate, as spelled out by the hearing officer, essentially constituted harmless error and should be disregarded because they did not negatively impact the development of the Proposed IEP or the provision of a FAPE. The Board also contends that, in any event, A.L.'s parents did not consent to his participation in the VAAP because they failed to agree to the Proposed IEP. The hearing officer, however, found the Board's procedural violations harmful, resulting in a lost educational opportunity for A.L., in that his

15

participation in the VAAP would have resulted in a more appropriate IEP that would have better "reflect[ed] the results of the assessment test and aid[ed] [A.L.'s] transition to the adult world." Administrative Decision at 45. Moreover, the hearing officer deemed A.L.'s "promotion" to the twelfth grade to be "troubling," in that the Board apparently had surreptitiously promoted him out of the eleventh grade, where testing was available, to the twelfth grade, where it was not. Id.[8] Finally, the hearing officer found that A.L.'s parents had specifically requested his participation in the VAAP, even though they did not sign off on the entire Proposed IEP. Id. at 44; see also id. at 5.

In the district court, the Board renewed its contention that its failure to comply with the IDEA's procedural mandate did not prejudice A.L.'s ability to receive a FAPE. See Court Decision at 5. The court determined, however, that the Board's contention on this point was insufficient to meet its burden of establishing that the hearing officer's finding was erroneous, and it thus affirmed the hearing officer on the Procedural Ruling. Id. at 6. In these circumstances, we agree that the Board's stark assertion that its procedural errors were harmless fails to overcome the prima facie

---

[8]Although the Board maintained at the Hearing that A.L.'s transition to the twelfth grade made him ineligible for participation in the VAAP, the Board subsequently allowed A.L. to participate therein. See Appellee's Supp. Br. at 1. Accordingly, it appears that A.L. is eligible for the VAAP, notwithstanding the Board's earlier assertion to the contrary.

16

correctness of the Administrative Decision, and we therefore affirm the Court Decision on the Procedural Ruling.

B.

With regard to the Sign Language Ruling, the Board contends on appeal that a VQAS Level III interpreter is unnecessary for A.L., because he rarely relies on sign language in order to be understood in school.[9] And ordinarily, of course, "[a court] should be reluctant . . . to second-guess the judgment of education professionals," as reflected in their development of a Proposed IEP. MM, 303 F.3d at 532. Indeed, a reviewing court is "obliged to defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special

---

[9]In Virginia, SLIs employed by the school districts must have the following qualifications:

> a Virginia Quality Assurance Screening (VQAS) Level III, any Registry of Interpreters for the Deaf Certificate (excluding Certificate of Deaf Interpretation), or any other state or national certification recognized by the Virginia Department for the Deaf and Hard-of-Hearing as equivalent to or exceeding the VQAS Level III.

See 8 Va. Admin. Code § 20-80-45(E)(1)(a). The VQAS assessment process involves interpreting sign language for a screening panel. To achieve a VQAS Level III, one must correctly interpret 80% of the signs presented. See 22 Va. Admin. Code § 20-30-110(D)(2)(b). The Board contends that it would be sufficient to provide a Level II interpreter (one who correctly interpreted 65% of signs presented in the VQAS assessment).

17

education and related services provides." Id. (internal quotation marks omitted).

In this case, however, the hearing officer found the communication assistance provided to A.L. by the Proposed IEP to be an inadequate accommodation, in that it fails to comply with Virginia's Regulations Governing Special Education Programs. See Administrative Decision at 48. Pursuant to Virginia law, the SLIs employed by the school districts must be certified at the VQAS Level III or higher. See 8 Va. Admin. Code § 20-80-45(E)(1)(a). As we have recognized, "[t]he IDEA expressly incorporates State educational standards," and the courts should not "usurp state educational standards and policy [by] re-writ[ing] state teaching certification requirements . . . ." Hartmann, 118 F.3d at 1004 (internal quotation marks omitted). Thus, the hearing officer was correct in concluding that the communication assistant proposed by the Board to assist A.L. (qualifying at VQAS Level II only) failed to comply with Virginia's regulatory requirements for personnel providing sign language interpretation services.

In the district court, the Board was permitted to present additional evidence, not heard or considered by the hearing officer, that A.L. made significant progress in communications skills in the year following the Hearing, and that he requires a VQAS Level II SLI only, because he seldom relies on an interpreter in order to be understood. The court, however, rejected this

18

proposition, and it agreed with the hearing officer that any sign language interpreter provided for A.L. had to meet the qualifications specified in Virginia's regulations. See Court Decision at 10. The court also affirmed the hearing officer's finding that the Board's failure to comply with Virginia's regulations had resulted in a proposed IEP that was not reasonably calculated to provide A.L. with a FAPE. Id. at 11. Although the pertinent Virginia regulations unequivocally mandate that all SLIs employed in Virginia's school districts be qualified at the VQAS Level III, see 8 Va. Admin. Code § 20-80-45(E)(1)(a), the Proposed IEP provided for an SLI qualified at the VQAS Level II only. We are therefore obliged to affirm the Court Decision on the Sign Language Ruling.

C.

In making the OT Ruling in the Administrative Decision, the hearing officer concluded that A.L. was entitled to continue receiving direct OT services, thereby rejecting the Board's contention that such services were unnecessary. In that regard, Herndon, testifying for the Board at the Hearing, asserted that she had been providing direct OT services to A.L. on a weekly basis since 2001 and that, based on her 2001 assessment of A.L., he did not require OT services at all. See Administrative Decision at 31. According to Herndon, the consultative (rather than direct) OT

19

services provided for as a compromise in the Proposed IEP would be sufficient to meet A.L.'s needs.  Id.

In response, A.L.'s parents submitted to the hearing officer the evaluation of Weisz, who had assessed A.L. in July 2003, just prior to the Hearing being conducted.  See Administrative Decision at 32.  Utilizing a "medical" (rather than an "educational") model, she concluded that A.L. suffered from a deficit in his motor and visual skills, causing him to have difficulty performing routine tasks, such as using both hands simultaneously or catching a ball. Id.  Weisz thus recommended that A.L. continue to receive direct OT services.  Id.  Additionally, A.L.'s parents presented the hearing officer with the testimony of Dr. Leichtman, who testified that OT services issues should be left "totally to the discretion of the therapist at the school," asking only that the therapist "evaluate [A.L.] and, if [the therapist deems] he needs treatment, to treat him."  J.A. 1016-17.

In concluding that A.L. was entitled to continue to receive direct OT services, the hearing officer credited Weisz's 2003 evaluation over Herndon's 2001 educational assessment and Dr. Leichtman's testimony, primarily because Weisz's evaluation was more recent.  See Administrative Decision at 49.  In so doing, the hearing officer observed that the deficits A.L. exhibited, such as being unable to use two hands simultaneously, were skills necessary in both school and in the workplace.  Id.  The hearing officer

20

therefore rejected the Board's contention that A.L. no longer required direct OT services.

In assessing the OT Ruling, the district court concluded that, "despite the deference typically due . . . the judgment of professional educators," the hearing officer's reliance on Weisz's assessment was justified because her 2003 report was more recent than the evaluations relied upon by the Board. See Court Decision at 10. In these circumstances, we are unable to say that the district court erred in deferring to the hearing officer's view of the evidence, and we thus affirm the Court Decision on the OT Ruling as well.[10]

---

[10]As discussed above, see supra notes 5 and 7, the hearing officer and the district court each concluded that the Proposed IEP was inadequate under the Rehabilitation Act, for the same reasons it was inadequate under the IDEA. Because we agree that the Proposed IEP did not comply with the IDEA, we need not resolve the question of the IEP's propriety under the Rehabilitation Act. We observe, however, that a failure to provide an appropriate IEP under the IDEA would not, in and of itself, establish discrimination under the Rehabilitation Act, absent some evidence of "bad faith or gross misjudgment" on the part of the school authorities. Sellers v. Sch. Bd. of Manassas, Va., 141 F.3d 524, 529 (4th Cir. 1998). And, as we have recognized, "to prove discrimination in the education context, 'something more than a mere failure to provide the 'free appropriate education' required by [the IDEA] must be shown.'" Id. (quoting Monahan v. Neb., 687 F.2d 1164, 1170 (8th Cir. 1982)).

V.

Pursuant to the foregoing, we reject the Board's contentions and affirm the judgment of the district court.

<u>AFFIRMED</u>