**SCHOOL BOARD OF THE CITY OF NORFOLK, Plaintiff,**

**v.**

**Daphne BROWN, as Parent and Next Friend of RP, Defendant.**

**Civil Action No. 2:10cv41.**

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 13, 2010.

Derek Anthony Mungo, Office of the City Attorney, Norfolk, VA, for Plaintiff.

Raymond Andrew Hartz, Legal Aid Society of Eastern Virginia, Norfolk, VA, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

RAYMOND A. JACKSON, District Judge.

Before the Court are the Parties' cross Motions for Summary Judgment. Having carefully reviewed the Parties' pleadings and considered the oral arguments, the Court finds that this matter is ripe for judicial determination. For the reasons stated herein, Plaintiff School Board of the City of Norfolk's Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part; Defendant Brown's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; and the final decision of the due process hearing officer is **AFFIRMED** in part and **REVERSED** in part.

### *OUTLINE OF OPINION*

I. FACTUAL AND PROCEDURAL HISTORY

II. LEGAL STANDARD

III. DISCUSSION

A. Count XII: The Factual Findings of the Due Process Hearing Officer

1. Procedural Considerations

2. The Hearing Officer's Manner of Expression

B. Provision of a Free Appropriate Public Education

1. Violation of the "Child Find" Provisions of the IDEA

a. The Individuals with Disabilities Education Act

b. Count II: Procedural Violation of Child Find

c. Count III: Substantive Violation of Child Find

2. The July 9 Manifestation Determination Review

a. Counts IV and V: MDR Procedural Violations

b. Count VI: MDR Substantive Violation

3. The Chrysalis Placement

a. Count XI: Change in Placement Procedural Violation

b. Count I: Change in Placement Substantive Violation

C. Counts VII, VIII, IX, and X: The Hearing Officer's Ordered Relief

## IV. CONCLUSION

## I. FACTUAL AND PROCEDURAL HISTORY

On January 20, 2010, Plaintiff, School Board of the City of Norfolk ("School Board"), filed a Complaint against Defendant, Daphne Brown ("Brown"), as the parent and next friend of minor RP, pursuant to certain provisions of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), seeking to appeal the administrative findings of the special education due process hearing officer.

RP ("Student") is an eleven year old student who was enrolled in Campostella Elementary School, which is operated by the School Board, from September 2004 to February 2009. Compl. ¶ 6–a. Student resides with his aunt and legal guardian, Daphne Brown. Compl. ¶ 5. Student suffers from several impairments which qualify him as a "child with disability," pursuant to 20 U.S.C. § 1401(3)(A), including right side hemiplegia (cerebral palsy) and seizure disorder. Compl. ¶¶ 6–k, 6–1. As a result of his disabilities, Student qualifies for special education and related services under the IDEA. Compl. ¶ 6–1. In accordance with the provisions of the IDEA, Student was classified under the disability category of "other health impaired" and an initial individualized education program ("IEP") was developed on December 20, 2006, in accordance with 20 U.S.C. § 1414. Compl. ¶¶ 6–1, 6–m. Though Student had exhibited some behavioral problems in the past, Student's initial IEP did not address any behavioral concerns. Compl. ¶¶ 6–f, 6–m. Student's IEP was subsequently modified in April 2007, January 2008, and January 2009; however none of the modifications included any behavioral goals or objectives or a behavioral intervention plan ("BIP"). Compl. ¶¶ 6–o, 6–r, 6–z.

On February 25, 2009, Student was suspended from school long term for leaving three threatening messages on the principal's voice mail. Compl. ¶¶ 6–cc, 6–ee. Student was subsequently admitted to the Virginia Psychiatric Center, after a school psychologist determined Student's behavior, in association with his disciplinary incident, to be bizarre. Compl. ¶¶ 6–dd, 6–ee. On March 3, 2009, a Manifestation Determination Review ("MDR") was conducted concerning Student's conduct that led to the suspension, in accordance with 20 U.S.C. § 1415(k)(1)(E). Compl. ¶ 6–ff. The MDR resulted in a finding that Student's conduct was not a manifestation of his disability. *Id.* Consequently, in April 2009, Brown filed complaints with the Virginia Department of Education ("VDOE"), asserting, *inter alia,* violations of state and federal law relating to the MDR conducted on March 3, 2009. Compl. ¶ 6–jj. After substantial investigation, on June 15, 2009, the VDOE issued a Letter of Findings, holding the School Board in noncompliance with federal law for failing to consider whether the behavioral conduct "had a direct and substantial relationship to" Student's disability. Compl. ¶ 6–nn; *see* 20 U.S.C. § 1415(k)(1)(E)(i)(I). On June 18, 2009, the School Board determined that Student would be placed in the Chrysalis Program ("Chrysalis") at Granby Elementary School for the 2009–2010 academic year. Compl. ¶ 6–oo. Following this determination, and in accordance with the VDOE's Letter of Findings, a second MDR was conducted on July 9, 2009. Compl. ¶ 6–pp. Again, the MDR resulted in a finding that Student's behavioral conduct was not a manifestation of his educational disability. Compl. ¶ 6–qq. Subsequently, on July 31, 2009, Brown, as parent and next friend of RP, requested a due process hearing against the School Board for violations of the IDEA.

On September 14, 2009, a seven-day hearing commenced before special education due process hearing officer Sarah

Smith Freeman ("Hearing Officer") to address the issue of whether Student's disciplinary placement in response to his threats against the principal constituted the least restrictive environment in which Student would receive a free appropriate public education ("FAPE"), pursuant to the IDEA. Compl. ¶ 8. The Hearing Officer heard evidence and oral arguments from both parties and issued a decision on the matter on October 23, 2009. Compl. ¶ 9. The Hearing Officer concluded, *inter alia,* that the School Board's disciplinary placement did not constitute the least restrictive environment for Student and that the School Board had failed to meet its requirements under the IDEA. Compl. ¶ 10.

In reaching her ultimate conclusions, the Hearing Officer found that, while the School Board's official records contained little information documenting Student's behavioral pattern, the guidance counselor's records, which were much more thorough, indicated a series of disciplinary events which placed the School Board on notice that Student was in need of a functional behavioral assessment and, ultimately a BIP, well before the disciplinary incident of February 2009. Sarah Smith Freeman, Va. Dep't of Educ., *In Re Brown v. School Board of the City of Norfolk* 23 (2009) [hereinafter *VDOE Decision* ]. Furthermore, the Hearing Officer determined that, though the School Board had evidence to suggest that Student suffered from one or more mental infirmities either in addition to or as a result of his physical ailments, the School Board, nevertheless failed to evaluate the effect of these mental difficulties on Student's behavior. *Id.* at 25. This failure constituted a substantial violation of the School Board's obligations under the "child find" provisions of the IDEA. *Id.*

With regard to Student's placement in the Chrysalis Program following the disciplinary incident of February 2009, the Hearing Officer found that the placement did not constitute the least restrictive environment in which Student would receive a FAPE. *Id.* at 25. The Hearing Officer determined that Student would be removed from his current general education environment and placed in an environment where he would attend school only with other children with disciplinary problems. *Id.* at 25–26. The Hearing Officer concluded that Student receives educational benefit from the inclusive setting, which he would not receive in the Chrysalis setting. *Id.* at 28. Further, the Hearing Officer also concluded that the School Board failed to comply with certain procedural requirements of the IDEA prior to changing Student's educational placement. *Id.* at 29–30; *see* 20 U.S.C. § 1415(k)(1)(E).

After determining that Student's placement in the Chrysalis Program was a direct result of the School Board's failure to implement the IEP, the Hearing Officer ordered the following forms of relief: (1) Brown to receive an independent educational evaluation of Student at public expense; (2) Brown and the school psychologist to complete ADHD testing of Student; (3) the IEP team to convene a meeting at the culmination of all ordered testing; (4) IEP team to implement Student's draft IEP of July 9, 2009; and (5) the School Board to provide Student with regular guidance counseling services as an IEP accommodation. *VDOE Decision,* at 33–34. Following the Hearing Officer's decision and order, the School Board filed the instant action in this Court on January 20, 2010, challenging several of the administrative findings of the Hearing Officer.

On September 13, 2010, the School Board filed its Motion for Summary Judgment seeking to set aside the administrative findings of the special education due process hearing officer. Brown, as parent

and next friend of RP, filed a Response in Opposition to Plaintiff's Motion and Defendant's Motion for Summary Judgment on September 24, 2010. Oral arguments on this matter were heard before this Court on October 21, 2010. Accordingly, this matter is now ripe for judicial determination.

## II. LEGAL STANDARD

■ The IDEA, 20 U.S.C. § 1400 *et seq.*, provides any party aggrieved by a decision reached at a due process hearing of the state educational agency with a right to bring a civil action in a United States district court. 20 U.S.C. § 1415(i)(2). A district court reviewing a decision of the educational agency "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate," § 1415(i)(2)(C). Accordingly, a reviewing court may grant summary judgment based on the administrative record of the hearing. *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F.Supp.2d 554, 561 (E.D.Va.2009).

■ A court reviewing an administrative decision under the IDEA, is "obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir.2002). However, district courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir.1997) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Once the reviewing court has given the administrative findings due weight, it is then "free to decide the case on the preponderance of the evi-

dence." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991)

In evaluating the administrative findings, findings of fact which are "regularly made" are taken to be "prima facie" correct and a reviewing court that fails to adhere to the factual findings of the agency must explain its deviation. *Id.* In determining whether such factual findings were "regularly made," a reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decisions and the methods employed." *Id.; see also Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P.*, 399 F.3d 298, 305 (4th Cir.2005) ("Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process."); *see, e.g., J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir.2008) ("In this case, there is nothing in the record suggesting that the hearing officer's process in resolving the case was anything other than ordinary. That is, the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.").

## III. DISCUSSION

■ In reviewing the substantive decisions of the Hearing Officer, the Court must first look to the factual findings of the hearing officer to determine whether such findings were "regularly made." *See Doyle*, 953 F.2d at 105. Thus, before turning to the Hearing Officer's ultimate conclusions that Student was denied FAPE, the Court will first determine whether the factual findings of the Hearing Officer

were regularly made and thus, should be considered "prima facie" correct. *See id.*

### A. Count XII: The Factual Findings of the Due Process Hearing officer

■ In determining whether the factual findings of the due process hearing officer were regularly made, a district court must "examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Id.* In Count XII of the Complaint, the School Board apparently argues that the Hearing Officer committed several procedural errors which would entitle this Court to afford her findings considerably less weight. *See* Compl. ¶¶ 45–47.

First, the School Board contends that the Hearing Officer allowed Brown's counsel to exceed time limits for examining witnesses, allowing Brown six days to present her case, when the hearing had originally been scheduled to last only five days total. Pl.'s Mem. Supp. at 47–48. Second, the School Board argues that the Hearing Officer failed to fairly allocate the scheduled time between the parties, providing Brown six days to present evidence, while limiting the School Board to only one day to present its case. *Id.* at 48. Third, the School Board asserts that the Hearing Officer failed to base her findings on a preponderance of the evidence, as the Hearing Officer neglected to acknowledge the evidence presented by the School Board. *Id.* at 48–49. Finally, the School Board argues that the Hearing Officer demonstrated a bias in favor of Brown by disregarding uncontradicted facts in the record and agreeing with misrepresentations of fact that Brown's counsel made. *Id.* at 49. The School Board's first two contentions concern the process that the Hearing Officer used, while the third and fourth contentions relate, not to the process used, but rather to the "manner in which the hearing officer expressed [her] view of the case." *See J.P.*, 516 F.3d at 260. Thus the Court will address the process the Hearing Officer used and the manner of expression separately.

#### 1. Procedural Considerations

■ The factual findings of an administrative hearing officer are entitled to a presumption of correctness where such findings were "regularly made." *Doyle*, 953 F.2d at 105. "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" *Z.P.*, 399 F.3d at 305 (quoting *Doyle*, 953 F.2d at 104). Though the Fourth Circuit has not precisely defined the necessary elements of a fact-finding process, precedent indicates that, at the very minimum, a proper hearing must allow both parties to present their case and the fact-finder must weigh the evidence presented in reaching factual determinations. *See J.P.*, 516 F.3d at 259 ("[T]here is nothing in the record suggesting that the hearing officer's process in resolving the case was anything other than ordinary. That is, the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case."); *see also Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F.Supp.2d 554, 569 (E.D.Va.2009) (holding that the Hearing Officer's factual findings were "regularly made" where "[a] proper hearing was held; witnesses from both sides testified and were cross-examined; voluminous exhibits were submitted; and the hearing officer was fully engaged in the process").

In this case, as in *J.P.*, the Hearing Officer allowed both parties to present evi-

dence, provided each side with an opportunity to cross-examine the witnesses of the other side, and considered the evidence presented in order to "resolve[ ] the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [her] responsibility to decide the case." *See J.P.*, 516 F.3d at 259. The School Board does not dispute that these basic due process tenants were available to it, but rather asserts that the process used in the due process hearing was flawed in two respects: (1) the Hearing Officer allowed Brown's counsel to exceed time limits for examining witnesses; and (2) the Hearing Officer allowed Brown six days to present her case, while restricting the School Board to only one day to present its case.

■ Upon close review of the administrative record, the Hearing Officer set time limitations for direct and cross examinations of witnesses, which were equally applicable to both parties. *See* Pre–Hr'g Report, at 2. The Hearing Officer described these time frames as "goals" which were "not meant to exclude testimony in any way." Due Process Hr'g Tr. vol. 1, 5:24–6:2, Sept. 19, 2009. Accordingly, throughout the proceedings, the Hearing Officer allowed testimony to exceed the pre-set time limitations in an attempt to allow the parties to fully present their case. However, it is not clear in the record that the Hearing Officer's decision to extend the time for witness examination was preferential towards either party. In fact, the Hearing Officer, in the interests of fairness, made an effort to allow the School Board's counsel additional time to cross-examine far beyond that set at the outset of the hearing. Due Process Hr'g Tr. vol. 6, 342:17–343:2, Oct. 12, 2009. Furthermore, even if the Hearing Officer had allowed Brown's counsel additional time to conduct direct examination, such a decision could not be considered "far from the accepted norm of a fact-finding process," as the Hearing Officer complied with all of the procedural safeguard required by the IDEA in conducting the hearing, *see* 20 U.S.C. § 1415(h), and Brown was the party bearing the burden of proof at the hearing, *see Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."). Thus, the Court finds that the Hearing Officer's extension of time for Brown's counsel to examine its witnesses does not constitute a procedural error which would cause the Court to diminish the weight given to the factual findings of the Hearing Officer.

■ Additionally, the School Board asserts that the Hearing Officer's failure to fairly allocate the time evenly among the parties was a procedural error which entitles the Court to give the Hearing Officer's findings less weight. Again, the Court must disagree. In oral argument, counsel for the School Board indicated that the School Board objected to the limited time to present its case after arguing its Motion to Strike. However, the record indicates that prior to the School Board arguing its Motion to Strike, counsel for Brown objected to the School Board calling witnesses on direct that Brown had previously called during her case-in-chief. Due Process Hr'g Tr. vol. 7, 5:6–13, Oct. 16, 2009, In response, counsel for the School Board asserted that requiring the School Board to conduct direct examination of witnesses during Brown's case-in-chief would impermissibly shift the burden of proof from Brown to the School Board. *Id.* at 5:18–7:10. In resolving Brown's objection, the Hearing Officer indicated that she would allow the School Board to conduct a direct examination of the witness that Brown had previously called during her case-in-chief. *Id.* at 8:8–9:4. Further-

more, the administrative record reveals, and counsel for the School Board conceded at oral argument, that the School Board was not prohibited from calling any of the witnesses that it wished to call during its rebuttal case, even though it presented evidence for only one day. Thus the Court finds that the procedural error the School Board alleges did not affect its ability to adequately present its case and thus does not require this Court to afford the findings of the Hearing Officer less weight.

## 2. The Hearing Officer's Manner of Expression

In addition to the alleged procedural errors addressed above, the School Board also argues that the Hearing Officer failed to base her findings on a preponderance of the evidence by neglecting to acknowledge the evidence the School Board presented, disregarding uncontradicted facts in the record and agreeing with misrepresentations of fact that Brown's counsel made. Pl's Mem. Supp. at 48–49. As with the procedural considerations, the Court finds that none of these contentions render the Hearing Officer's findings so deficient as to be deprived of deference.

While, generally, the Court should focus the inquiry of whether factual findings were "regularly made" on the procedure used in reaching factual determinations, the Fourth Circuit has recognized that "the manner in which a hearing officer's factual findings are presented could be so deficient as to deprive the opinion of the deference to which it would otherwise be entitled." *J.P.*, 516 F.3d at 260. However, the standard set forth in *Doyle* "does not require the hearing officer to explain in detail its reasons for accepting the testimony of one witness over that of another." *Z.P.*, 399 F.3d at 306; *see also J.P.*, 516 F.3d at 261 ("[Fourth Circuit] case law does not require an IDEA hearing officer

to offer a detailed explanation of his credibility assessments.").

In this case, the Hearing Officer's opinion was far from deficient. The Hearing Officer issued a lengthy, 35–page opinion, including 16 pages detailing her factual findings, complete with references to the administrative record. Though the Hearing Officer did not explicitly state that she found Brown's witnesses to be more credible than those of the School Board or refute the School Board's evidence, such an explanation is not required by the IDEA or applicable case law. *See J.P.*, 516 F.3d at 261. Furthermore, it is implicit in the Hearing Officer's decision that she considered the evidence before her and found Brown's evidence to be more persuasive on some points and the School Board's evidence to be more persuasive on others. The School Board's characterization of the evidence Brown presented as "misrepresentations of fact" cannot shift the duty to assess the credibility of witnesses from the Hearing Officer to this Court. It is not for this Court to question or judge the credibility determinations of the Hearing Officer who actually heard and evaluated the testimony presented. *See Z.P.*, 399 F.3d at 307 ("[C]redibility determinations implicit in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings.").

Furthermore, given that the due process hearing spanned over several weeks, consisting of the lengthy testimonies of dozens of witnesses, and produced over a thousand transcript pages, it would be impossible for the Hearing Officer to have discussed all of the factual evidence presented in the record when rendering her decision. Thus it was entirely appropriate for the Hearing Officer to focus on the facts that were most relevant in reaching her ultimate conclusions. *See J.P.*, 516 F.3d at 262 ("While it would of course be

preferable for hearing officers to explain their analysis in as much detail as possible, a hearing officer's failure to meet this aspirational standard does not provide a basis for concluding that the factual findings contained in a statutorily compliant written opinion were not regularly made and therefore not entitled to deference."). Thus, the Court finds that the Hearing Officer's consideration of the evidence and testimony presented was sufficient to afford her findings the deference required under *Rowley* and *Doyle* and, accordingly, this Court will take the findings of the Hearing Officer as prima facie correct. Plaintiff School Board's Motion for Summary Judgment is **DENIED** and Defendant Brown's Motion for Summary Judgement is **GRANTED** as to Count XII of the School Board's Complaint.

### B. Provision of a Free Appropriate Public Education

Having determined that the Hearing Officer's factual findings were "regularly made" and therefore are entitled to presumptive correctness, the Court must turn to whether the Hearing Officer properly concluded that Student was denied FAPE. The Hearing Officer found that Student was denied FAPE in two primary respects. First, the Hearing Officer found that the School Board's failure to evaluate Student for mental disease or defects that might affect his behavior constituted a violation of the School Board's obligations under the "child find" provisions of the IDEA. *VDOE Decision*, at 25. Thus Student was denied FAPE when he was not subjected to a functional behavioral assessment or provided a behavioral intervention plan ("BIP"). *Id.* Second, the Hearing Officer found that Student was denied FAPE when he was required to attend the Chrysalis Program as a result of the disciplinary incident of February 2009. *Id.* The Hearing Officer found that, not only was the Chrysalis placement more restric-

tive than the general education inclusion environment designated in Student's most recent Individualized Education Program ("IEP"), but also neither Manifestation Determination Review ("MDR") that the School Board conducted satisfied the procedural requirements of the IDEA. *Id.* at 25, 28, 29.

### 1. Violation of the "Child Find" Provisions of the IDEA

In Counts II and III of the School Board's Complaint, the School Board raises alleged errors the Hearing Officer made, all pertaining to the Hearing Officer's ultimate conclusion that Student was denied FAPE as a result of the School Board's violations of the "child find" provisions of the IDEA. In Count II, the School Board argues that the Hearing Officer erroneously determined that the School Board failed to fully evaluate Student's suspected disabilities which may have adversely impacted his academic performance during the 2007–2008 and 2008–2009 academic years. Pl.'s Mem. Supp. at 26–30. The School Board maintains that the Hearing Officer erred in her interpretation of the law, as the IDEA does not require school boards to fully evaluate a student in order to identify suspected disabilities. Pl.'s Mem. Supp. at 26. Similarly, Count III asserts that the Hearing Officer erred in concluding that the School Board should have provided Student with specially designed instruction, a functional behavioral assessment and a BIP. Pl's Mem. Supp. at 30–35. Specifically, the School Board argues that the Hearing Officer disregarded the informed judgment of professional educators in crafting Student's IEP and instead substituted her own opinion. Pl's Mem. Supp. at 31–32. Before addressing the merits of the School Board's claims, the Court will examine the statutory text and history of the IDEA.

### a. The Individuals with Disabilities Education Act

The IDEA was promulgated in order "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In order to achieve the stated goals of the IDEA, the statute authorizes federal assistance to states that comply with the provisions of the Act. § 1412(a). Notably, the Act imposes an affirmative obligation on any state receiving federal assistance to identify and evaluate all children suffering from disabilities who may be in need of special education and related services. § 1412(a)(3). Specifically, the IDEA requires that "[a]ll children with disabilities residing in the State, . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." § 1412(a)(3)(A). This duty is known as the "child find" obligation. The "child find" duty extends even to "[c]hildren who are suspected of being a child with a disability . . . even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1).

Among the other requirements specified for state qualification, is the mandate that the state provide a "free appropriate public education" ("FAPE") to all children with disabilities, including those with disabilities who have been suspended or expelled. 20 U.S.C. § 1412(a)(1)(A). A FAPE consists of "special education and related services that have been provided at public expense, under public supervision and direction, and without charge . . . and are provided in conformity with the individualized education program." § 1401(9). Furthermore, a FAPE is marked by "edu-cational instruction specially designed to meet the unique needs of the handicapped child, . . . supported by such services as are necessary to permit the child to benefit from the instruction." *Z.P.*, 399 F.3d at 300 (quoting *Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034).

In order to satisfy the FAPE requirement, the School Board must provide an "individualized education program" ("IEP") for each child with a disability. 20 U.S.C. § 1412(a)(4). The IEP is a written statement for each child with a disability that includes, *inter alia*, information about the child's current academic progress, including how the child's disability affects that progress, and a statement of the child's academic and functional goals. § 1414(d)(1)(A). The IEP is developed by an IEP team, which is comprised of the disabled child's parents, at least one regular education teacher and one special education teacher of the child, a representative of the local educational agency, and others who may have knowledge or special expertise regarding the disabled child. § 1414(d)(1)(B). In developing an appropriate IEP, the IEP team is required to consider the strengths of the child, the concerns of the parents, the results of any evaluation of the child, the academic, developmental and functional needs of the child, and, where the child's behavior impedes his learning or that of others, "the use of positive behavioral interventions and supports, and other strategies, to address that behavior." § 1414(d)(3)(A)–(d)(3)(B)(i). "An IEP is sufficient if it is 'reasonably calculated to enable the child to receive educational benefits.'" *Z.P.*, 399 F.3d at 300 (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034).

In examining whether the School Board provided Student with a FAPE, the Court must conduct a two-part assessment. First the Court must determine

whether the State complied with the procedures as set forth in the IDEA and second, the Court must look to whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Jaynes ex rel. Jaynes v. Newport News Sch. Bd.,* 13 Fed.Appx. 166, 172 (4th Cir.2001). Accordingly, "[f]ailure to meet IDEA'S procedural requirements is an adequate ground for holding that the public school failed to provide a free appropriate public education." *Id.* The Hearing Officer found both procedural and substantive violations of the IDEA in determining first, that the School Board failed to comply with the procedural requirements set forth in the "child find" provisions of the IDEA, and second, that Student's IEP was inadequate because it failed to address Student's behavioral problems. *VDOE Decision,* at 25.

### b. Count II: Procedural Violation of Child Find

■ Though case law analyzing the "child find" provisions of the IDEA are scarce, failure to comply with the "child find" mandate may constitute a procedural violation of the IDEA. *See Forest Grove Sch. Dist. v. T.A.,* — U.S. —, 129 S.Ct. 2484, 2495, 174 L.Ed.2d 168 (2009) ("A reading of the [IDEA] that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services."). The "child find" provision of the IDEA imposes on States a requirement that "[a]ll children with disabilities residing in the State, ... regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). The "child find" duty extends even to "[c]hildren who are suspected of being a child with a disability

... even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1). Furthermore, where a child is suspected of being a child with a disability, the local educational agency shall ensure that "the child is assessed in *all* areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B) (emphasis added).

■ Though the "child find" duty does not impose a specific deadline by which time children suspected of having a qualifying disability must be identified and evaluated, evaluation should take place within a "reasonable time" after school officials are put on notice that behavior is likely to indicate a disability. *W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir.1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791 (3d Cir.2007). Thus, the "child find" obligation is triggered where the state has reason to suspect that the child may have a disability and that special education services may be necessary to address that disability. *Dept. of Educ., State of Haw. v. Cari Rae S.,* 158 F.Supp.2d 1190, 1194 (D.Haw.2001). A local educational agency is deemed to have knowledge that the child may suffer from a disability where (1) "the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;" (2) "the parent of the child has requested an evaluation of the child pursuant to section 1414(a)(1)(B);" or (3) "the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency." 20 U.S.C. § 1415(k)(5)(B).

■ In order to establish a procedural violation of the "child find" requirement,

the claimant "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir.2007) (adopting the standard set forth in *Clay T. v. Walton Cnty. Sch. Dist.*, 952 F.Supp. 817, 823 (M.D.Ga.1997)); *see also M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir.1996) ("[A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a de minimis educational benefit must correct the situation."). In this case, the Hearing Officer found that the School Board failed to evaluate and identify Student's suspected disabilities which had been adversely affecting his behavior during the 2007–2008 and 2008–2009 academic school years. *VDOE Decision*, at 32. Specifically, the Hearing Officer found that several behavioral incidents leading up to Student's February 2009 suspension placed the School Board on notice that Student's current disability or a new developing disability warranted a functional behavioral assessment and, potentially, the development of a BIP. *Id.*

■ Giving due weight to the factual findings of the Hearing Officer, the Court finds that the Hearing Officer's conclusions regarding the School Board's duties under the "child find" provisions are supported by substantial evidence. As early as June 2005, the school's Eligibility Committee reported that Student's psychiatric issues, possibly related to his seizures, could be the basis for Student's behavioral issues. *Id.* at 11. The Hearing Officer also found that the school guidance counselor documented several behavioral incidents involving Student during the 2007–2008 and 2008–2009 academic school years, including making threats against, becoming physical with, and harassing other classmates. *Id.* at 17–19. Student

was also suspended on three other occasions prior to the disciplinary incident of February 2009. *Id.* at 18–19. Furthermore, the hearing revealed that in October 2008, Student was removed from school and referred to a behavioral program, the Alternatives to Violent Behavior Program ("AVBP"), based on his making verbal threats to other students. *Id.* at 13. AVBP provided several suggestions to school officials concerning Student's unsatisfactory behavior, including recommending that Student receive behavior consequences, appropriate support and immediate feedback in order to achieve behavioral modification, and providing Student with a Positive Behavior Support Plan to address his needs. *Id.* at 13–14. However, the school failed to implement the plan. *Id.* at 14. Considering the above factual findings of the Hearing Officer, the Court finds that there was substantial evidence to support the Hearing Officer's conclusion that the School Board "overlooked clear signs of disability" and thus failed to fully evaluate Student's suspected disabilities which adversely impacted his academic performance during the 2007–2008 and 2008–2009 academic years. This constituted a procedural violation of the "child find" provisions of the IDEA. Therefore, Plaintiff School Board's Motion for Summary Judgment is **DENIED** and Defendant Brown's Motion for Summary Judgement is **GRANTED** as to Count II of the Complaint.

#### c. Count III: Substantive Violation of Child Find

In addition to arguing that the Hearing Officer erroneously determined that the School Board failed to fully evaluate Student, in Count III of the Complaint, the School Board also asserts that the Hearing Officer erred in concluding that the School Board should have provided Student with specially designed instruction, a functional

behavioral assessment and a BIP prior to the February 2009 suspension. Compl. ¶ 17. This allegation concerns, not the procedure the School Board followed, but rather the substance of Student's then-existing IEP and whether it was "reasonably calculated to enable the child to receive educational benefits." *Z.P.*, 399 F.3d at 300 (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034).

■ "Whether an IEP is appropriate and thus sufficient to discharge a school board's obligations under the IDEA is a question of fact", entitled to deference under the *Doyle* standard. *Z.P.*, 399 F.3d at 307. While neither the due process hearing officer nor the district court may "substitute their own notions of sound educational policy for those of the school authorities which they review," *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034, such restriction does not "relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate," meaning "reasonably calculated to enable the child to receive educational benefits," *Z.P.*, 399 F.3d at 307. Under the IDEA, where a child's behavior impedes the child's learning or that of others, the IEP team must consider "the use of positive behavioral interventions and supports, and other strategies, to address that behavior" in developing the child's IEP. 20 U.S.C. § 1414(d)(3)(B)(i).

■ In this case, the Hearing Officer determined that the evidence presented indicated that the Student's behavioral pattern required that the School Board implement IEP behavioral goals or a BIP prior to the disciplinary incident of February 2009. *VDOE Decision,* at 28. The Hearing Officer's conclusion appears to stem partly from the fact that Student was removed from school and referred to the AVBP behavioral modification program as a result of his unsatisfactory behavior to-

wards other students in October of 2008. *See id.* at 26. The Hearing Officer found that this removal demonstrated that Student's behavior had begun to affect his academic performance. The Court agrees with this conclusion. The Hearing Officer could have rationally concluded, based on the evidence presented, that Student's behavior was impeding his learning or the learning of other students prior to the disciplinary incident of February 2009. Supporting the Hearing Officer's conclusion was not only the fact that Student was removed from school and placed in a behavioral modification program for eight days, but also that the professional educators at AVBP provided Student with a behavioral intervention plan, complete with information concerning triggers to Student's behavior and insight into situations likely to escalate such behavior; yet the School Board failed to implement or acknowledge the plan going forward. *Id.* Based on these factual circumstances, the Court finds that there was substantial evidence to support the Hearing Officer's determination that, as a factual matter, Student's behavior impeded his learning or that of others at some point prior to the disciplinary incident of February 2009. Therefore, the Hearing Officer correctly concluded that the IDEA imposed a duty to implement positive behavioral interventions and supports to address Student's behavior.

Additionally, the School Board's reliance on the deference afforded professional educators is misplaced. The School Board argues that the Hearing Officer's determination was erroneous because several professional educators testified that Student's behavior did not interfere with his learning or that of others and that the nature and quantity of disciplinary incidents did not indicate that Student was in need of specially designed instruction, a functional behavioral assessment or a BIP. *See* Pl.'s

Mem. Supp. at 33–34. The School Board maintains that the Hearing Officer should have adhered to the professional judgment of the educators rather than inserting her own, uninformed opinion. *Id.* at 32. While it is true that "absent some statutory infraction," educators alone are tasked with providing an education compliant with the IDEA, *Hartmann,* 118 F.3d at 1000, "the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate," *Z.P.,* 399 F.3d at 307. The requirement for deference to professional educators articulated in *Tice v. Botetourt County School Board,* 908 F.2d 1200, 1207 (4th Cir.1990), and reiterated in MM, 303 F.3d at 532, applies to the content of a disabled student's IEP and not to the question of whether the IEP enables the child to achieve educational benefit. *See Tice,* 908 F.2d at 1207.

In this case, the Hearing Officer did not evaluate the content of Student's IEP, but rather recognized that the School Board failed to comply with the IDEA by not addressing Student's behavior in any manner within the IEP. Had the School Board included behavioral considerations within Student's IEP with which the Hearing Officer disagreed, the deference standard would be applicable. But where, as here, the IEP is not specially designed to meet Student's unique needs with regard to his behavioral issues, the IEP did not provide Student with FAPE. Thus, the Hearing Officer correctly concluded that Student's January 2009 IEP, which was in place at the time of the February 2009 disciplinary incident, did not provide any meaningful way for Student to achieve educational benefit in response to his behavioral difficulties. Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Count III of the Complaint.

### 2. The July 9 Manifestation Determination Review

In Counts IV, V, and VI of the School Board's Complaint, the School Board asserts several alleged errors that the Hearing Officer made relating to her determination that Student was denied FAPE when he was removed from his current educational placement following his suspension in February of 2009. As with the "child find" duties, the Hearing Officer found both procedural and substantive violations of the IDEA when considering whether Student was denied FAPE based on his February 2009 suspension. Procedurally, the School Board raises two related challenges. First, in Count IV, the School Board asserts that the Hearing Officer erred in determining that the School Board conducted a "flawed" second MDR on July 9, 2009. Pl.'s Mem. Supp. at 38. Similarly, in Count V, the School Board maintains that the Hearing Officer erred in ruling that the School Board failed to fully implement the VDOE's corrective action plan in order to resolve Brown's complaint about the flawed original MDR of March 3, 2009. Pl's Mem. Supp. at 35–38.

Substantively, in Count VI, the School Board challenges the Hearing Officer's finding that the July 9 MDR inquiry into whether Student's conduct was the result of the School Board's failure to implement the IEP should have been answered in the affirmative. Pl.'s Mem. Supp. at 38–41. Specifically, the School Board asserts that it was required only to implement the IEP that was in effect at the time of the disciplinary action, and that IEP did not include a BIP. *Id.* at 40. The Court will address the Hearing Officer's asserted procedural and substantive IDEA violations separately.

#### a. Counts IV and V: MDR Procedural Violations

Pursuant to the IDEA, school personnel may remove a disabled student who has

violated a code of conduct from his current educational setting under limited circumstances. Where school personnel intend to place the disabled child in an alternative educational setting for a period of more than ten school days, the school must first determine that the student's behavior was not a manifestation of his disability. *See* 20 U.S.C. § 1415(k)(1)(C). In conducting this inquiry, within ten days of any decision to change the student's placement, the local educational agency, the parent, and relevant members of the students IEP team (collectively, the "MDR team") shall "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—(I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP." § 1415(k)(1)(E)(i). Where the MDR team answers either of the above inquiries in the affirmative, the student's conduct shall be determined to be a manifestation of his or her disability and the student shall be returned to the educational placement from which he or she was removed. §§ 1415(k)(1)(E)(i), 1415(k)(1)(F)(iii).

In this case, Student was subjected to two separate MDR proceedings. Student's initial MDR, which occurred on March 3, 2009 and was within ten days following the school's decision to suspend Student, was found to be procedurally faulty by the VDOE. Compl. ¶ 6–nn. The VDOE issued a "corrective action plan" directing the MDR team to "promptly convene a properly comprised IEP meeting to determine, using the applicable regulatory standard, whether [Student's] behavior was a manifestation of his disability." *Id.* Accordingly, a second MDR was conducted on July 9, 2009. Compl. ¶ 6–pp. The Hearing Officer found that this second MDR did not comply with the procedural requirements set forth in the IDEA. Specifically, the Hearing Officer noted that the MDR team did not conduct the MDR over again, but rather limited its inquiry to the question of whether Student's conduct "had a direct and substantial relationship to" his disability. *VDOE Decision,* at 30. The Hearing Officer found that such "fragmenting" conflicted with "the spirit of the IDEA in the conduct of a complete MDR." *Id.* Furthermore, several of the individuals present at the initial MDR were not in attendance at the second meeting and Student's parent was denied participation by being told that the purpose of the meeting was only to redo the particular question on the School Board's form. *Id.* Additionally, the MDR team conducted only a "record review" and failed to consider relevant information, including a report based on a psychiatric evaluation of Student which was conducted following the behavior which led to his suspension. *Id.* The Hearing Officer further found that no formal discussion of the issues ever occurred "with all of the relevant information, at the same time, in the same room with the correct legal standard in place." *Id.* Thus, the Hearing Officer found that the July 9 MDR substantially violated the procedural requirements of the IDEA.

■■■ As previously mentioned, a school board's failure to satisfy the procedural requirements of the IDEA can constitute a denial of FAPE. *See Jaynes,* 13 Fed.Appx. at 172. However, "[w]hen such a procedural defect exists, [courts] are obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." *MM. ex rel. DM. v. Sch. Dist. of Greenville Cnty.,* 303 F.3d 523, 533 (4th Cir.2002). In this case, the Hearing Officer cited five procedural er-

rors which gave rise to her conclusion that the second MDR was procedurally flawed and that the MDR team failed to comply with the VDOE's corrective action plan: (1) the MDR team "fragmented" the manifestation determination inquiry by addressing only one question; (2) different individuals were present at the second MDR than were present at the first; (3) Student's parent was denied parental participation; (4) the MDR team conducted only a record review of the evidence; and (5) the MDR team failed to review the Student's psychiatric report which had not been available during the first MDR. *See VDOE Decision,* at 30. It was the compounding of these procedural violations that led the Hearing Officer to conclude that Student was denied FAPE. The Court finds that this determination was supported by substantial evidence.

■ The cornerstone of the IDEA is the notion that every disabled child shall be provided with "meaningful access" to public education, through provision of some educational benefit. *A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 319 (4th Cir.2004). Where a procedural violation deprives a disabled child of that educational benefit, such violation may constitute a denial of FAPE. *See M.M.,* 303 F.3d at 533. In this case, the Court finds that the Hearing Officer reasonably concluded that the July 9 MDR was so procedurally faulty as to deny Student FAPE. Both the IDEA and the VDOE's "corrective action plan" required the MDR team to determine "whether [Student's] behavior was a manifestation of his disability." When the MDR team failed to properly conduct this inquiry at the first MDR, it was obligated to reconvene to make this determination during the second MDR. In making the manifestation determination, the MDR team was required to consider each prong of the inquiry as set forth in 20 U.S.C. § 1415(k)(1)(E)(i). Failing to do so not only deprived Student of the full and com-

plete consideration required under the IDEA before removal, but also deprived his parents of participation in the MDR process. The denial of parental participation, as found by the Hearing Officer, is a substantial and serious violation of the IDEA. *See Schaffer,* 546 U.S. at 53, 126 S.Ct. 528 ("The core of the statute, however, is the cooperative process that it establishes between parents and schools."). Further, as the Hearing Officer noted, the most egregious procedural violation was the failure to consider the psychiatric report which was generated as a result of Student's admission to the Virginia Psychiatric Center, which was a direct consequence of the behavioral incident at issue at the MDR. The IDEA requires the MDR team to consider *"all* relevant information" and certainly a psychiatric evaluation based upon the subject disciplinary incident would be relevant to the determination of whether the conduct leading to that disciplinary incident was a manifestation of Student's disability. *See* 20 U.S.C. § 1415(k)(1)(E)(i) (emphasis added).

Furthermore, the School Board's reliance upon *Fitzgerald v. Fairfax County School Board,* 556 F.Supp.2d 543 (E.D.Va. 2008), fails to undermine the Hearing Officer's findings. In *Fitzgerald,* a disabled student and his parents launched a procedural attack on the MDR which concluded that his behavioral conduct was not a manifestation of his disability. *See id.* at 546. The parents in *Fitzgerald* alleged several procedural violations including, *inter alia,* selecting MDR team members who were not "relevant" members of the child's IEP team, violating the parents' right to determine whether the child's conduct was a manifestation of his disability, and failing to require MDR team members to review all relevant information prior to the MDR meeting. *Id.* at 552. The Court held that "relevant members" of the IEP team need not know the child personally in order to

participate in the MDR, so long as each MDR team member "serve[s] some purpose pertinent to the MDR." *Id.* at 556. Furthermore, the Court found that while the IDEA does require parental involvement and participation in the MDR process, it does not allow parents to veto a decision of the MDR team or require the decision of the MDR team to be unanimous. *Id.* at 557–58. Finally, the Court held that the IDEA does not require the MDR team to review all relevant information *before* the MDR meeting, so long as prior to reaching a manifestation determination, the MDR team does in fact review the information. *Id.* at 559. Thus the Court concluded that none of the procedural errors that the student's parents alleged gave rise to a denial of FAPE. *Id.* at 561.

The procedural errors that the Hearing Officer relied on in this case are wholly distinguishable from those addressed in *Fitzgerald.* First, in this case, the Hearing Officer did not find that Student's parent was not allowed to "veto" or overrule the finding of the MDR team, but rather determined that Student's parent was denied parental participation altogether. *See VDOE Decision,* at 30. Student's parent was told that there would be no additional record review and that the purpose of the meeting was only to address the second question which had been neglected at the previous meeting, and thus, she was precluded from presenting additional evidence. *See id.* Furthermore, as to the review of the record and the psychiatric report, the Hearing Officer concluded that the error was in the fact that no additional review took place, not *when* the review took place, as was the case in *Fitzgerald. Id.; see also Fitzgerald,* 556 F.Supp.2d at 558–59 ("[T]he [Hearing Officer's] factual finding regarding the information actually reviewed by the MDR committee members is entitled to deference."). Finally, while *Fitzgerald* may support the School Board's contention that the Hearing Officer erroneously determined that it was error for different team members to be present at the second MDR than were present at the first and for members to be present who did not personally know Student, this mistake does not give rise to a duty to overturn the Hearing Officer's ultimate conclusion that Student was denied FAPE based on the procedurally faulty MDR.

The other errors that the Hearing Officer relied on offer generous support for her conclusion that the manner in which the July 9 MDR was conducted denied Student educational benefit. Unlike the MDR conducted in *Fitzgerald,* it appears that the second MDR was approached with a closed mind and the outcome was predetermined, Student's parent was denied parental participation, and no meaningful discussion took place. *Cf. Fitzgerald,* 556 F.Supp.2d at 561 (noting that "the MDR committee did not approach the hearing with closed minds, but rather carefully considered all information at the hearing before making their determination" and that the student's parents "were afforded an opportunity to participate in the MDR hearing, that team members carefully discussed [the student's] background and his role in the [disciplinary] incident, and, only at the conclusion of the meeting, did the committee members conclude that [the student's] conduct was not a manifestation of his disability"). Thus the Court finds that the Hearing Officer's conclusion was supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Counts IV and V of the Complaint.

### b. Count VI: MDR Substantive Violation

In addition to arguing that the Hearing Officer erroneously determined that the

July 9 MDR was procedurally faulty, in Count VI of the Complaint, the School Board also asserts that the Hearing Officer erred in concluding that the MDR team should have found that Student's conduct which led to the disciplinary incident of February 2009 was "a direct result of the School Board's failure to implement the Student's IEP." Compl. ¶ 28. Specifically, the School Board asserts that it was required only to implement the IEP that was in effect at the time of the disciplinary action, and that particular IEP did not include a BIP. Pl.'s Mem. Supp. at 40. This allegation relates not to the procedure that the MDR team followed, but rather to the substance of the MDR team's determination. *See generally AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 684–85 (4th Cir.2004).

As indicated above, the IDEA requires the MDR team to consider whether "the conduct in question was the direct result of the local educational agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i)(II). The Hearing Officer apparently found that the MDR team erroneously answered this particular inquiry in the negative based on the fact that the School Board had previously violated the "child find" provisions of the IDEA by not conducting a functional behavioral assessment or BIP prior to February 2009. *See VDOE Decision*, at 33. Although the courts have not interpreted this provision of the IDEA, it appears that the Hearing Officer misapplied the plain language of the statute in reaching her conclusion that the inquiry should have been answered in the affirmative.

 In this case, it is undisputed, as Student never raised the issue, that the School Board had been implementing student's most recent IEP, dated January 9, 2009. The January 2009 IEP did not include any behavioral goals or a BIP. The clear language of the statute indicates that the MDR team must consider whether Student's conduct was based on the School Board's failure to implement the *IEP* and not on the School Board's failure to provide Student with a *FAPE*. The two concepts, though related, are not synonymous. So even where, as here, it is clear that the School Board failed to meet its obligations under "child find," and that this failure deprived Student of FAPE, this was not the inquiry that was anticipated by the IDEA. Had the IDEA provided that a student's conduct shall be determined to be a manifestation of his disability where the school board fails to provide the student with a FAPE, the Hearing Officer's ruling would stand. However, the Court will not read into the plain language of the statute, a meaning that Congress did not anticipate. Accordingly, the Court finds that the Hearing Officer's application of the law was erroneous, as there is nothing to suggest that Student's conduct was a direct result of the School Board's failure to implement the IEP of January 2009. Thus, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgement is **DENIED** as to Count VI of the Complaint. However because the Court determined that the MDR was so procedurally faulty as to constitute a denial of FAPE, no further action is warranted from the Hearing Officer on this issue. *See* discussion *infra* Part III.B.2.a.

### 3. The Chrysalis Placement

In Counts I and XI of the School Board's Complaint, the School Board raises procedural and substantive challenges to the Hearing Officer's determination that Student's placement in the Chrysalis Program, which followed the disciplinary incident of February 2009, was erroneous. Procedurally, in Count XI, the School Board claims that the Hearing Officer erred in ruling that Student's placement in

Chrysalis was improper because there was no consensus of the IEP team. Compl. ¶ 43. According to the School Board, there was no evidence in the record to support the Hearing Officer's finding that there was no consensus of the IEP team in determining Student's educational placement. Pl's Mem. Supp. at 45. Substantively, in Count I, the School Board contends that the Hearing Officer erred in concluding that the School Board's placement of Student in Chrysalis for the 2009–2010 academic year failed to provide him with a FAPE in the least restrictive environment. Compl. ¶ 12. Specifically, the School Board asserts that the IDEA does not require a school board to duplicate educational services for a student who has been assigned to an alternative educational program due to a disciplinary incident, so long as the student's IEP may still be implemented. Pl.'s Mem. Supp. at 23–24. Again, the Court will address the alleged procedural violations and substantive violations separately.

### a. Count XI: Change in Placement Procedural Violation

■■■ The IDEA provides that, where a disabled child's "change in placement" "would exceed 10 school days and the behavior that gave rise to the violation of the school code is determined not to be a "manifestation of the child's disability", the "interim alternative educational setting" shall be determined by the IEP team.[1] 20 U.S.C. § 1415(k)(2); *see also* 34 C.F.R.

§ 300.530(d)(5) ("If the removal is a change of placement under § 300.536, the child's IEP Team determines appropriate services under paragraph (d)(1) of this section."). Pursuant to 34 C.F.R. § 300.536, a "change of placement" occurs where, *inter alia*, "[t]he removal is for more than 10 consecutive school days." Furthermore, the IDEA specifically anticipates that decisions pertaining to a disabled child's educational placement be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116.

The School Board contends that there was no evidence in the record to support the Hearing Officer's determination that the decision to place Student in Chrysalis was made by the School Board and not by the IEP team as required under the IDEA. However, the School Board's letter, dated June 18, 2009, which notified Student and his parent of the decision to place Student in Chrysalis, specifically indicates that the decision was made by the School Board at a meeting held on June 17, 2009. Furthermore, none of the IEP notifications from the time of the original MDR on March 3, 2009 to the date of Student's removal to Chrysalis indicate that Student's interim educational placement had been discussed or decided by the IEP team. Thus, there was substantial evidence to support the Hearing Offer's conclusion that the decision to place Student

---

1. For the purposes of addressing the argument in Count XI of the Complaint, the Court will presume that Student was removed from his current educational setting based upon a determination that his conduct was not a "manifestation of his disability," though the Court ruled above that the MDR team failed to properly conduct this inquiry prior to Student's removal to the Chrysalis Program. The IDEA requires that, outside of the disciplinary context, "the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e). Thus, because the record makes clear that Student's parent did not participate in the determination that Student should be placed in Chrysalis, the procedural requirements of the IDEA would not have been satisfied based on the Court's determination that the MDR was improper and thus, Student should have been returned to the placement from which he was removed. *See* 20 U.S.C. § 1414(k)(1)(F)(iii).

in Chrysalis was made by the School Board and not by the IEP team as required. As indicated above, the IDEA mandates that the IEP team, which consists of the student's parent and other persons with personal knowledge of the student, shall make any determination about a disabled student's interim educational placement. This procedural violation constitutes a denial of FAPE as it has "[s]ignificantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child." *See* 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2)(ii). Thus, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Count XI of the Complaint.

### b. Count I: Change in Placement Substantive Violation

In addition to finding that the decision to place Student in the Chrysalis Program was procedurally flawed because it was not made by the IEP team, the Hearing Officer also found that the Chrysalis placement was inappropriate because it failed to provide Student with a FAPE in the least restrictive environment. *VDOE Decision*, at 28, 31. The School Board contends that the Hearing Officer erred in reaching her conclusion because the School Board was not required to duplicate educational services for a student who had been placed in an alternative educational program as a result of a disciplinary incident. Pl.'s Mem. Supp. at 23. Moreover, the School Board asserts that the Chrysalis placement was a general education setting in which Student's IEP could be successfully implemented. *Id.* at 24–25. However, as Brown pointed out in her brief, the School Board's arguments presume that a MDR was properly conducted and correctly determined that Student's conduct was not a manifestation of his disability, prior to his assignment to

Chrysalis. *See* Def.'s Mem. Opp. at 9. As previously mentioned, the Court finds that neither MDR was properly conducted and Student should have never been removed from his current educational placement based on the procedurally faulty March 3 MDR or the subsequent, and equally flawed, July 9 MDR. *See* discussion *infra* Part III.B.2.a.

 Furthermore, even had Student been properly disciplined under 20 U.S.C. § 1415(k)(1)(C), substantial evidence exists to support the Hearing Officer's conclusion that the Chrysalis Program would not constitute the least restrictive environment in which Student could receive a FAPE. Where a disabled child has been correctly removed from his current educational placement for a violation of a code of conduct, the school board must, nevertheless, ensure that the child "[c]ontinue[s] to receive educational services ... so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 C.F.R. § 300.530(d)(1)(i). The requirement that the child be educated in the "general education curriculum" reflects the notion that disabled children must be placed in the "least restrictive environment" in which they can receive a FAPE. *See M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 327 (4th Cir.2009); *DeVries By DeBlaay v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989) ("Mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act."). Particularly, the IDEA requires that "[t]o the maximum extent appropriate, children with disabilities ... are educated with chil-

dren who are not disabled." 20 U.S.C. § 1412(a)(5)(A).

▉▉ While the "mainstreaming" requirement is vital to the provision of FAPE, it is not absolute. *See AW*, 372 F.3d at 681; *see also* 20 U.S.C. § 1412(a)(5)(A) (noting that removal of disabled children from the regular educational environment should occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily"). Accordingly, "mainstreaming" is not required where "(1) the disabled child would not receive an educational benefit from mainstreaming into a regular class; (2) any marginal benefit from mainstreaming would be significantly outweighed by benefits which could feasibly be obtained only in a separate instructional setting; or, (3) the disabled child is a disruptive force in a regular classroom setting." *Hartmann*, 118 F.3d at 1001.

▉▉ In this case, the Hearing Officer found that Student was receiving educational benefit in his general education placement that he would not receive in the Chrysalis setting. *VDOE Decision*, at 28. At Campostella Elementary School, Student was actively participating in various activities and courses with other, non-disabled students and those courses were specifically included within his IEP. *Id.* The Hearing Officer found that access to such programs was essential to Student's development of social skills and peer relationships and that Student would be restricted from such access in the Chrysalis program. *Id. Cf. AW*, 372 F.3d at 682 ("To the extent that a new setting replicates the educational program contemplated by the student's original assignment and is consistent with the principles of "mainstreaming" and affording access to a FAPE, the goal of protecting the student's "educational placement" served by the

"stay-put" provision appears to be met. Likewise, where a change in location results in a dilution of the quality of a student's education or a departure from the student's LRE-compliant setting, a change in "educational placement" occurs."). Furthermore, there is no evidence in the record to suggest that Student was a disruptive force in the classroom setting, as the majority of Student's disciplinary incidents, including the subject incident of February 2009, occurred outside of the classroom. Such factual determinations by the Hearing Officer are entitled to deference under the *Doyle* standard and this Court will not disturb them. Accordingly, the Court finds that there was substantial evidence to support the Hearing Officer's determination that the Chrysalis placement was not the least restrictive environment in which Student could receive FAPE.

Thus, because the Court concludes that Student should have never been removed from his general education placement at Campostella Elementary School and, in any event, the Chrysalis Program was not the least restrictive environment in which Student could receive FAPE, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Count I of the Complaint.

## C. Counts VII, VIII, IX, and X: The Hearing Officer's Ordered Relief

In Counts VII, VIII, IX, and X of the School Board's Complaint, the School Board challenges four orders that the Hearing Officer issued in favor of Student. First, in Count VII, the School Board argues that it was error for the Hearing Officer to order that Brown was entitled to an independent educational evaluation ("IEE") at public expense because there was no evidence that Brown disagreed

with the evaluation the school psychologist conducted. Pl's Mem. Supp. at 41–42. Second, in Count VIII, the School Board finds error in the Hearing Officer's order that the School Board test Student for ADHD and amend the IEP based upon the test results. *Id.* at 42–43. Third, in Count IX, the School Board states that it should not be required to implement the draft IEP of July 9, 2009 because Student's parent specifically rejected that IEP. *Id.* at 43. Finally, in Count X, the School Board disputes the Hearing Officer's order that the School Board provide Student with guidance counseling services as an IEP accommodation, because parental consent was never granted to do so. *Id.* at 44–45. In response to each of these contentions, Brown argues in her brief that the issues raised in Counts VII, VIII, IX, and X are now moot. *See* Def.'s Mem. Opp. at 22–23. The Court agrees that Counts VII, VIII, and IX are now moot and are thus, non-justiciable, however, the Court concludes that the issue raised in Count X is "capable of repetition, yet evading review" and will therefore address it on the merits *See DeVries by DeBlaay v. Spillane,* 853 F.2d 264, 268 (4th Cir.1988) (quoting *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)).

■■■■■ "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (quoting *Cnty. of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). However, where the controversies raised are "ongoing and viable," the issues cannot be considered moot. *See Cnty. Sch. Bd. of York Cnty., Va. v. A.L.,* 194 Fed.Appx. 173, 178 (4th Cir.2006). In this case, the IEE and ADHD testing which the School Board contests have already been completed. Thus, there is no present controversy which exists for the Court to adjudicate.

Similarly, the draft IEP that the School Board argues it is unable to implement because Student's parent failed to provide written consent for it to do so, has now been superceded by Student's current IEP. Thus, this issue is also moot. Accordingly, Plaintiffs Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Counts VII, VIII, and IX of the Complaint.

■■■■ The Hearing Officer's order that the School Board provide Student with guidance counseling services, however, is not moot and remains an issue of controversy as it is "capable of repetition, yet evading review." The School Board may be required to continue the provision of guidance counseling services in the future as an IEP accommodation. The School Board asserts that the Hearing Officer had no authority to order regular guidance counseling services as an IEP accommodation. Pl.'s Mem. Supp. at 45. However, a Hearing Officer may order that "compensatory" educational services be provided prospectively to compensate for a past deficient program. *Compare G ex rel. RG v. Fort Bragg Dependent Schs.,* 343 F.3d 295, 308–09 (4th Cir.2003) (applying the theory of "compensatory education" to courts reviewing a hearing officer's decision under the IDEA), *with Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 522 (D.C.Cir.2005) (citing *RG,* 343 F.3d at 308 and extending the theory of "compensatory education" to hearing officers). "Compensatory education involves discretionary, prospective, injunctive relief crafted . . . to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *RG,* 343 F.3d at 309.

■■■■ In this case, the Hearing Officer found that Student was entitled to counsel-

ing services to address escalating behavior which the School Board had previously ignored, in violation of the "child find" provisions of the IDEA. The Hearing Officer's order compelling the School Board to provide counseling services was not an abuse of discretion. As addressed *infra* Part III.B.1, the School Board failed to provide Student with a FAPE by failing to adequately address Student's emerging behavioral and psychological issues after having adequate reason to suspect that Student may have a disability and that special education services may be necessary to address that disability. Accordingly, the Hearing Officer found, based on the behavioral intervention plan developed by AVBP, that Student could benefit from guidance counseling services. *VDOE Decision,* at 34. The Court finds that the Hearing Officer's equitable order for the provision of guidance counseling services was supported by substantial evidence. Thus, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgement is **GRANTED** as to Count X of the Complaint.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff School Board of the City of Norfolk's Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part and Defendant Brown's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED** on Counts I, II, III, IV, V, VII, VIII, IX, X, XI, and XII. Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED** on Count VI. Accordingly, the final decision of the due process hearing officer is **AFFIRMED** in part and **REVERSED** in part in accordance with this Opinion.

However, based on the procedural posture of this case as discussed *infra* Part III. B.2.b, no further action from the Hearing Officer is required.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel and parties of record.

**IT IS SO ORDERED.**